*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0169p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SHARON ISABEL; RICHARD PARKER; GREGORY
SANDERS; WALTER WILLIAMS, JR.,
　　　　　　　　　　*Plaintiffs-Appellees/*
　　　　　　　　　　*Cross-Appellants,*

　　　*v.*

CITY OF MEMPHIS,

　　　　　　　　　　*Defendant-Appellant/*
　　　　　　　　　　*Cross-Appellee.*

Nos. 03-5912/5914/6011/6231

>

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 01-02533 —Jon Phipps McCalla, District Judge.

Argued: November 4, 2004

Decided and Filed: April 11, 2005

Before: MARTIN and BATCHELDER, Circuit Judges; O'MEARA, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Louis P. Britt III, Thomas J. Walsh, Jr., FORD & HARRISON, Memphis, Tennessee, for Appellant. David M. Sullivan, Memphis, Tennessee, for Appellees. **ON BRIEF:** Louis P. Britt III, Thomas J. Walsh, Jr., FORD & HARRISON, Memphis, Tennessee, J. Matthew Stephens, LAWRENCE & RUSSELL, Memphis, Tennessee, for Appellant. David M. Sullivan, Memphis, Tennessee, for Appellees.

　　　MARTIN, J., delivered the opinion of the court, in which O'MEARA, D. J., joined. BATCHELDER, J. (pp. 10-11), delivered a separate dissenting opinion.

---

[*] The Honorable John Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

———————————

**OPINION**

———————————

BOYCE F. MARTIN, JR., Circuit Judge.  African-American sergeants in the Memphis Police Department brought suit against the City of Memphis for engaging in discriminatory promotions in violation of Title VII of the Civil Rights Act of 1964.  The district court found that the City's written test—specifically, the test's cut-off score—discriminated against African-American candidates.  In the remedy phase, the court promoted the sergeants to lieutenant and awarded back pay.  The court also awarded attorney fees and stayed enforcement of its judgment pending this appeal.  The City appeals the district court's finding of discrimination, choice of remedy, and award of attorney fees; the sergeants, on cross-appeal, contest the stay.

I.

In July of 2000,  one hundred twenty sergeants competed for promotion to lieutenant.  Of those, sixty-three were black and fifty-seven were white.  The City informed the candidates that the promotional process would consist of four components: (1) a written test, (2) a practical exercise test, (3) performance evaluations for the previous two years, and (4) seniority points.  These four components would account for twenty percent, fifty percent, twenty percent, and ten percent, respectively, of each candidate's total score.  Those who passed the written test would proceed to the next three components; those who did not pass would not be invited to continue in the process. The City also informed the candidates that it would create a list, in descending order, of the candidates' total scores, and would make promotions based on the ranking of the total scores.

The written test was developed by a private consultant and managed by an industrial psychologist, Dr. Mark Jones, who also developed the City's written test for the 1996 promotions. In developing the 2000 test, Dr. Jones relied on the assistance of Memphis police officers who were identified as having expertise in their profession.  Dr. Jones provided the officers with "training on how to construct a good test item," and the officers drafted items for questions by identifying what knowledge is necessary to performing an identified set of tasks as a lieutenant.  Dr. Jones then created the questions and had the group of officers critique them for plausibility and reliability. Together, they estimated the percentage of minimally qualified candidates who could answer the questions correctly in order to impose a cutoff score.

This case arises from the City's use of the cutoff score, which has some relevant history. Long before the 2000 written test was developed, the City entered into a Memorandum of Understanding with the police department, in which it was agreed that in order to be eligible for promotion to lieutenant, a candidate must achieve a passing score of seventy on a written job knowledge test.  Despite this agreement, Dr. Jones did not use or recommend using a cutoff score in the 1996 written test.  Consequently, after the 1996 exam was administered, the police officers' union filed a grievance against Dr. Jones, alleging that he violated the Memorandum of Understanding.  Based on his experience in 1996, Dr. Jones used the cutoff score in 2000 and failed all candidates who scored below seventy on the written test.

As a result, not enough minority candidates in proportion to nonminority candidates passed the test.  This result violated the Equal Employment Opportunity Commission's four-fifths rule. The four-fifths rule, found at 29 C.F.R. § 1607.4(d), provides:

> A selection rate for any race, sex, or ethnic group which is less than four-fifths (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while

a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

The passing rate of African-Americans was less than four-fifths of the passing rate of nonminorities. To avoid such adverse impact, Dr. Jones lowered the cutoff score by four points, to sixty-six. Dr. Jones also eliminated nine of the test questions because he deemed them faulty; he gave all candidates credit for answering the questions correctly so that scores would remain on a one hundred-point scale.

Under the new cutoff score, ninety-eight candidates passed the test. Of those, fifty-one were white and forty-seven were black.

All parties agree that this result did not violate the Commission's four-fifths rule; however, other statistical analyses—including the T-test and the Z-test—did show an adverse impact. Under the T-test, which measures the difference in mean scores between minority and nonminority candidates, minority candidates' mean score was 69.17 while the white candidates' mean score was 75.59; the difference, 6.42, was described by plaintiffs' expert, Dr. Richard Deshon, as large. Under the Z-test, which measures statistical success across groups, white candidates passed at a rate of 90% while minority candidates passed at a rate of 74.6%. Dr. Deshon testified that the 15.4% difference is statistically significant. Thus, even though the written test did not violate the Commission's four-fifths rule, alternative analyses showed that the success differential between minority and nonminority candidates was statistically significant.

After the written test results were tallied and the candidates were ranked, the top ninety-eight candidates were invited to continue in the promotional process. The ranking order created by the written test scores served as the initial de facto order in which passing candidates were promoted to lieutenant.

Problems resulted from ranking candidates based on their written test scores. These problems concerned the accuracy of the test in approximating job performance and are illustrated by two examples presented by plaintiffs at trial. In one example, a non-minority candidate who received the same initial score on the written test as two of the plaintiffs, and presumably would not have been eligible to proceed to the next rounds of the promotion process, was determined to be eligible for promotion after the City imposed the cutoff score of sixty-six and gave full credit for the nine faulty questions. Once all the components of the promotional process were tallied, this candidate was ranked as the second most qualified for promotion. This candidate was only barely eligible based on the written test scores to proceed in the promotion process, yet she received the second highest total score and ranking in the pool of candidates.

In another example, thirteen candidates who placed very low in the ranking order had to be retroactively promoted and issued back pay because the candidates' performances on the practical exercise—a video component which was administered late in the process—required the City to drastically adjust the rankings. The City granted those thirteen candidates back pay and seniority points retroactive as of July 12, 2000, the date that the first pool of candidates was promoted to lieutenant.

The four plaintiffs failed the written test. They each received scores below 66—Sanders, 65; Isabel, 64; Williams, 63; and Parker, 57—and were ranked 110, 111,112, and 113, respectively; thus, they were not allowed to proceed to the subsequent promotional assessments. Subsequently, plaintiffs filed discrimination charges against the City.

Incidentally, this is not the first time that the City has faced discrimination-based challenges to the July 2000 promotion process. During the administration of the July 2000 test, the City was informed that the practical exercise component of the test for promotion to sergeant had been

compromised due to the advance release of unauthorized study materials. The City denied that the test component had been compromised and continued to administer the test to its completion. When members of the news media produced copies of the test while it was still being administered, the City admitted that the practical exercise component had been compromised. The City eliminated that component from the July 2000 promotional process and increased the weight of the written test and the performance evaluations.

Subsequently, African-American and Hispanic-American police officers who were vying for promotion to sergeant filed claims of discrimination, alleging that the City intentionally discriminated against them by eliminating the practical exercise component and by increasing the weight of the written test after the promotional process had been completed. They requested that the sergeants who were awarded promotions based on the July 2000 tests be required to compete in a new promotional process, and that any sergeant shown to have received, used, and benefitted from unauthorized study materials be disqualified from competing in the new promotional process. They succeeded and were provided the requested relief. *See Johnson v. City of Memphis*, 73 Fed.Appx.123, 128-29 (6th Cir. 2003).

The district court made similar findings in the instant case. Based primarily on the statistical analyses of the T- and Z-tests, the court found that the written test, as applied, unlawfully discriminated against minority candidates. The district court also relied on Dr. Deshon's testimony that the cutoff score was incapable of distinguishing between candidates who can and cannot perform the job of lieutenant. The district court was impressed by the evidence, provided in the two examples described above, that the test's contents were not valid and the related ranking order was unreliable.

Following the bench trial, the court held an evidentiary hearing on remedies. The court found that the sergeants were entitled to promotion to lieutenant as of July 12, 2000 (the date that the first pool of candidates was promoted), and compensation for back pay and overtime in the amount of the difference between the salaries of sergeant and lieutenant from that date to the date that the court's order was entered. The court noted that it "cannot say which of the Plaintiffs, if any, would have been promoted but for the illegal discrimination," and, "err[ing] on the side of the Plaintiffs," promoted all of them.

Subsequently, the court considered plaintiffs' request for attorney fees. The City argued that the award should be reduced because the sergeants did not succeed on three of their four claims. The court found that its rejection of some of plaintiffs' legal theories on a common set of facts did not affect the monetary judgment or equitable remedies requested. Because the sergeants gained "excellent results," the court awarded all requested fees and expenses.

Finally, the district court stayed execution of its order pending appeal to this Court. The sergeants filed an "emergency motion" appealing the stay. This Court denied the motion on September 23, 2003, citing the traditional factors considered in stay appeals and determining that the stay was not an abuse of discretion.

II.

A.     Title VII

This Court's standard of review in a Title VII discrimination case is narrow. Under Federal Rule of Civil Procedure 52(a), a district court's findings of fact should not be reversed unless clearly erroneous. *Zamlen v. City of Cleveland*, 906 F.2d 209, 217 (6th Cir. 1990), *cert. denied*, 499 U.S. 936 (1991). Clear error will lie only when the reviewing court is left with the definite, firm conviction that a mistake has been made. *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573 (1985) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). The issue

is not whether the district court reached the best conclusion, but whether the evidence before the court supports the district court's findings. *Heights Cmty. Congress v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985), *cert. denied*, 475 U.S. 1019 (1986). Also, the district court's findings based on the credibility of the witnesses before it are entitled to great deference on appeal. *Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 543 (6th Cir. 1989).

Title VII proscribes employment practices that are "fair in form but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). Discrimination occurs when an employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity. . . ." 42 U.S.C. § 2000e-2(k)(1)(A)(I).

The Supreme Court has devised a three-part burden-shifting test to determine whether an unlawful disparate impact exists in any particular case. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975). First, the plaintiff must establish a prima facie case of discrimination—i.e., the plaintiff must establish that an adverse impact has occurred. If the plaintiff succeeds, the employer must show that the protocol in question has "a manifest relationship to the employment"—the so-called "business justification." *Griggs*, 401 U.S. at 432. If the employer succeeds, the plaintiff must then show that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect. *Albemarle*, 422 U.S. at 425, 432.

### i. Prima Facie Case

A prima face case is established when: (1) plaintiff identifies a specific employment practice to be challenged; and (2) through relevant statistical analysis proves that the challenged practice has an adverse impact on a protected group. *Johnson v. U.S. Dept. of Health and Human Servs.*, 30 F.3d 45, 48 (6th Cir. 1994) (citing *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 907-08 (6th Cir. 1991)). The City argues that plaintiffs failed to establish a prima facie case because they failed to show that the use of the cutoff score resulted in an adverse impact on minorities under the Equal Employment Opportunity Commission's four-fifths rule. The City contends that we should only consider the four-fifths rule, and no other measure, to determine whether an adverse impact has occurred. Thus, the determinative question in this case is whether we may look to alternative statistical analyses—the T- and Z-tests—to find an adverse impact.

The City contends that caselaw in our Circuit forbids reliance on alternative statistical analyses in Title VII cases. To the contrary, we require only that the statistical analyses be "relevant." *Johnson*, 30 F.3d at 48. Also, the Supreme Court has approved the use of a case-by-case approach, recognizing that statistics "come in infinite variety and . . . their usefulness depends upon all of the surrounding facts and circumstances." *Teamsters v. United States*, 431 U.S. 324, 339-40 (1977). Moreover, commentary to the Commission's regulations allows for exceptions to the four-fifths rule: "Smaller differences in selection rate may nonetheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, and ethnic origin." 29 C.F.R. § 1607.4(d).

The City also argues that the district court erred because the test complied with the four-fifths rule, and a test's compliance with the four-fifths rule definitively establishes the absence of adverse impact. This is also incorrect. The Commission's regulations make explicit that compliance with the four-fifths rule establishes only that the four-fifths statistical analysis will not serve as evidence of an adverse impact. The rule states: "a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact." 29 C.F.R.

§ 1607.4(d). Thus, notwithstanding a test's compliance with the four-fifths rule, other analyses may still reveal an adverse impact.

Indeed, when the Supreme Court stated that a plaintiff may rely solely on statistical evidence to establish a prima facie case of disparate impact, *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656-57 (1989), it did not say what kind of statistical evidence should be relied on. Neither the Supreme Court nor this Court has ever limited a plaintiff's choices in Title VII cases involving statistical analysis in any way.[1] Moreover, we are grateful for statistics beyond the four-fifths rule analysis because we prefer to look to the sum of statistical evidence to make a decision in these kinds of cases. *See N.A.A.C.P. v. City of Mansfield*, 866 F.2d 162 (6th Cir. 1989) (approving finding of district court that the sum of plaintiffs' statistical evidence "demonstrated a marginally statistically significant disproportionate impact on blacks").

ii. Business Justification

The Supreme Court has established that once a plaintiff has presented a prima facie case, a burden of production lies with the employer to demonstrate a business justification for the challenged employment practice. *Wards Cove*, 490 U.S. at 659-60. The Equal Employment Opportunity Commission has developed Uniform Guidelines, 29 C.F.R. 1607.1-.16, for establishing the validity of these tests and procedures. According to the Guidelines, employers may use three types of studies to validate an employee selection procedure: content-, construct-, or criterion-related validity studies. 29 C.F.R. § 1607.5(A); s*ee also Zamlen v. City of Cleveland*, 906 F.2d 209, 218 (6th Cir. 1990).

The City attempts to justify the written test by content-related validity. A test will have content validity if there is a direct relationship between the test contents and the job contents. *Williams v. Ford Motor Co.*, 187 F.3d 533, 538-43 (6th Cir. 1999). To establish whether contents of an employment test are job-related, the employer must show that the contents are "predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." *Williams*, 187 F.3d at 539 (internal citations omitted). To validate a cutoff score, the inference must be drawn that the cutoff score measures minimal qualifications. The Guidelines provide that "where cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force." 29 U.S.C. § 1607.6(h). The district court found that "the cutoff score was nothing more than an arbitrary decision and did not measure minimal qualifications." Here, the district court emphasized that the cutoff score was never validated by any of the methods suggested in the Uniform Guidelines.

Dr. Jones was asked whether the cutoff score was validated in the following passage:

Q:        "You didn't attempt to, quote, validate the cut score, did you?"

---

[1]We are aware that this Court limited its analysis to the four-fifths rule in the case of *Black v. City of Akron*, 831 F.2d 131 (6th Cir. 1987). The City suggests that our analysis in *Black* dictates our ruling in this case. However, *Black* is distinct from the situation here, and, moreover, the ruling in that case has been offset by subsequent rulings of the Supreme Court and this Circuit. In *Black*, claimants argued that a small sample size, where fewer black candidates than white candidates passed a test, revealed a discriminatory impact despite the test's comportment with the four-fifths rule. *Black* involved no alternative statistical analyses showing the adverse impact, and this Court did not consider the question of whether it would rely on alternative analyses to find an adverse impact in situations where the four-fifths rule was not violated. That is the question presented in this case, and *Black* is inapplicable. Furthermore, the Supreme Court's holding in *Ward Cove*, 490 U.S. at 656-57, and this Court's decision in *N.A.A.C.P. v. City of Mansfield*, 866 F.2d 162 (6th Cir. 1989), imply that other statistical analyses may be considered; or, at the very least, these decisions make clear that we are not limited to the four-fifths rule.

A:      "No."

Dr. Jones also testified that he did not want to use a cutoff score and saw no value in implementing one; he explained that the only reason he used one was because the union forced him to.

The court also faulted the test for measuring only one component (job knowledge) and failing to test the entire job domain. This fact was confirmed by Dr. Jones, who testified that he designed the written test only to test job knowledge, and sought to measure the "other major elements of the job" in the remaining components of the promotion process. The district court found that in effect, the ranking orders based on the written test had no value because they could not be trusted to be related to actual job performance.

The district court was particularly impressed by the two examples illustrated by plaintiffs at trial. Referring to the nonminority candidate who failed the written test but was ultimately ranked second highest in line for promotion, the court stated that "[t]his piece of evidence clearly dispels any inference that the written test approximated job performance."

We agree that there is clear evidence that the scores from the written test did not approximate a candidate's potential job performance. The district court did not abuse its discretion in finding that the test had no business justification.

Because the City fails to meet its burden of production, we conclude the Title VII analysis in this case. The district court correctly ruled that the City's written test violated Title VII.

B.      Promotion and Back Pay

If a district court finds that an employer has engaged in an unlawful employment practice, Title VII authorizes an award of back pay and other retroactive relief. *See* 42 U.S.C. § 2000e-5(g)(1); *see also Loeffler v. Frank*, 486 U.S. 549, 558 (1988). As the Supreme Court explained in *Loeffler*, the back pay award authorized by Title VII "is a manifestation of Congress' intent to make 'persons whole for injuries suffered through past discrimination.'" *Id.* (quoting *Albemarle*, 422 U.S. at 421).

Where racial discrimination is found, "the (district) court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154 (1965). "The general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed as near as may be, in the situation he would have occupied if the wrong had not been committed." *Wicker v. Hoppock*, 6 Wall. 94, 99 (1867). The Congressional Record, 118 Cong. Rec. 7168 (1972), makes clear:

> The [remedy provisions of Title VII] are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible. In dealing with the present section 706(g) the courts have stressed that the scope of relief under that section of the Act is intended to make the victims of unlawful discrimination whole, and that the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of, but also requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination.

Congress' purpose in vesting a variety of "discretionary" powers in the courts was "to make possible the 'fashion(ing) (of) the most complete relief possible.'" *Albemarle*, 421 U.S. at 425 (citing 118 Cong. Rec. 7168).

The district court found that the most complete relief possible includes both an award of back pay and promotion retroactive as of July 12, 2000, because plaintiffs would have been promoted and received lieutenants' salaries but for the unlawful discrimination. We agree with the district court, despite the City's arguments to the contrary. The City argues that plaintiffs are not entitled to promotion or back pay because there is no assurance, even had the sergeants passed the promotional process, that they would have been promoted to lieutenant because the police department often operates below budget and may not have hired all passing candidates. However, the City does not present any evidence to support this contention, and, thus failing to meet its burden, *see Wooldridge*, 875 F.2d at 547 (holding that defendant bears burden of demonstrating "by a preponderance of the evidence that factors other than the condemned discrimination caused the decision of which claimant complains"), we dismiss its argument.

The City also contends that none of the plaintiffs would have ranked high enough on its eligibility list even if no cutoff score had been used. However, as the district court correctly stated, the "ranking was invalid because only job knowledge had been tested in the written test, not the entire job domain, . . . the rank orderings were indeed unreliable and should not have been used in the promotion considerations. Relying on that same rank ordered list at this juncture would be inconsistent with the Court's judgment in the liability phase."

Third, the City contends that the statistical analyses relied on by the district court showed that only two of the four plaintiffs ranked within the group eligible for a promotion. Because the district court reasonably concluded earlier that the test could not approximate job performance and had no business justification, the City cannot now successfully argue that only two of four plaintiffs could be eligible based on the tests results.

C.    Attorney Fees

Title VII provides that "the court, in its discretion, may allow the prevailing party [in litigation under Title VII] . . . a reasonable attorney's fee . . . as part of the costs." 42 U.S.C. § 2000e-5(k). The sergeants requested an award of attorney fees, costs, and expenses pursuant to 42 U.S.C. § 2000e-5(k) (1994). The district court awarded the amount requested: fees of $184,461 and costs of $36,786. The court accepted the plaintiffs' lawyer's hourly rate, $250 per hour, and his contribution, 590.7 hours, as reasonable. The City argues on appeal that the award was unreasonable and should be reduced.

We review a district court's award of attorney fees for abuse of discretion. *Cramblit v. Fikse,* 33 F.3d 633, 634 (6th Cir. 1994). We affirm unless the court's ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the record. *Id.* Because the same standards are "generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party,'" *Hensley v. Eckerhart*, 461 U.S. 424, 433 n. 7 (1983), we rely on precedents involving attorney fees without regard to whether they involved Title VII or some other federal statute.

The trial court's initial point of departure, when calculating reasonable attorney fees, is the determination of the fee applicant's "lodestar," which is the proven number of hours reasonably expended on the case by an attorney, multiplied by a reasonable hourly rate. *Hensley*, 461 U.S. at 433. The reasonableness of the hours—here, 590.7—and rate—$250 per hour—is determined by considering twelve factors: (1) time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the

fee is fixed or contingent; (7) time and limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Reed*, 179 F.3d at 471-72 n.3 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

The City argues that the rate should be adjusted downward based on numerous listed tasks which could have been performed at a lower hourly rate. Plaintiffs' lawyer, however, is a solo practitioner who does not operate with the assistance of paralegals or support staff. The City also argues that their counsel's average hourly rate of $150 is more reasonable than plaintiffs' counsel's rate. However, the City's lead counsel's hourly rate was $270; the City can make no argument that is based on comparison.

"'[T]he most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'" *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (quoting *Hensley*, 461 U.S. at 436). Where a plaintiff has obtained excellent results, his attorney should recover a full compensatory fee; if a plaintiff obtains "limited success, the district court should award only that amount of fees that is reasonable in relation to the success obtained." *Hensley*, 461 U.S. at 435. This Court has stated that a reduction in attorney fees is to be applied only in rare and exceptional cases where specific evidence in the record requires it. *Adcock-Ladd*, 227 F.3d at 349-50.

The City contends that the award should be reduced by fifty-three percent because plaintiffs did not succeed on three of their four claims. The district court found that no reduction was appropriate because the plaintiffs obtained excellent results. Indeed, they could not have achieved better results. A proffer of alternative arguments does not justify reducing an award, especially where the arguments were made on a common set of facts and success on just one of the arguments would achieve the hoped-for results. This is not one of those rare and exceptional cases in which a reduced award is justified.

D.    Stay

The district court granted the City's motion to stay enforcement of the judgment pending appeal. The sergeants appeal the stay, which expires upon entry of this decision, arguing that they are being irreparably harmed in the meantime.

Another panel of this Court has previously denied plaintiffs' appeal of the stay. We adopt that panel's decision and its reasoning as stated in its order of September 23, 2003.

### III.

For the foregoing reasons, we affirm the district court's judgment in all respects.

———————————

**DISSENT**

———————————

        ALICE M. BATCHELDER, Circuit Judge, dissenting. I dissent because the plaintiffs have failed to demonstrate that the City's use of a cut-off score, which required applicants to answer 66 of the 100 questions on the written portion of the examination correctly, had an adverse impact on African-Americans in violation of Title VII. At the insistence of the Police Union, the City agreed to impose a cut-off score on the written part of the examination, which applicants would be required to achieve in order to be considered for promotion to lieutenant. Before administering the test, Dr. Mark Jones, an industrial psychologist hired by the City to create the promotional exam, set the cut-off score at 70. With a cut-off score of 70, the pass rate of African-American candidates was less than 45% of that of whites. In order to achieve compliance with the EEOC's "four-fifths rule," which says that a selection rate for any race which is more than four-fifths of the rate for the group with the highest rate will generally not be regarded as evidence of adverse impact, *see* 29 C.F.R. § 1607.4D (2004), the City adopted Dr. Jones's recommendation that the cut-off score be lowered to 66. With a cut-off score of 66, the pass rate of African-Americans was 83.4% of that of whites.

        Despite the fact that the written exam yielded a pass rate that satisfied the four-fifths rule, the Majority, relying on alternative forms of statistical analyses such as the T- and Z-Tests, concludes that the City's use of a minimum cut-off score creates an adverse impact in violation of Title VII. In my view, however, the law of this Circuit requires that when the results of the employment action in question satisfy the four-fifths rule, courts are not to look for other statistical analyses that might reveal an adverse impact. *Black v. City of Akron*, 831 F.2d 131 (6th Cir. 1987) a published Sixth Circuit case that makes a cameo appearance in the first footnote of the Majority's opinion, analyzed whether an examination that satisfied the four-fifths rule still created an adverse impact, and addressed the concerns of some commentators and courts that the four-fifths rule is not a useful indicator of adverse impact when a small sample of employees is being tested. The court stated that "the small size of the sample might be a reason to rule that there was no *prima facie* case even if the 4/5 rule were violated, but it is certainly not a reason for finding a *prima facie* case when the 4/5 rule is not violated" and held that the plaintiffs' statistical evidence was not suggestive of discrimination. *Id.* at 134. The Majority distinguishes *Black*, which it says "did not consider the question of whether it would rely on alternative analyses to find an adverse impact." That *Black* did not consider alternative forms of statistical analyses is exactly the point: courts in this Circuit do not consider alternative analyses *when the employment practice in question satisfies the four-fifths rule*. The Majority's opinion does not cite, and my research failed to uncover, any cases from this Circuit where the court looked to other statistical analyses to find an adverse impact when the results of the employment action in question satisfied the four-fifths rule.

        The Majority's misunderstanding of *Black*'s rule is evidenced by its citation to *N.A.A.C.P v. City Mansfield*, 866 F.2d 162 (6th Cir. 1989), which it says "impl[ies] that other statistical analyses may be considered," in support of the proposition that *Black* "has been offset by subsequent rulings." The *City of Mansfield* court did indeed consider alternative forms of analyses, such as the "chi-square," which, according to the plaintiff's expert witness, suggested that the "differing examination pass ratios for whites and blacks on the police test were not attributable to chance." *Id.* at 167. But the results of the test at issue in that case did not satisfy the four-fifths rule, and *City of Mansfield*, therefore, does not permit the conclusion that we are free to seek out and rely on

alternative forms of statistical analysis to find an adverse impact in cases where the four-fifths rule has otherwise been satisfied.[1]

For the past 20 years, employers like the City of Memphis have relied on the bright line four-fifths rule to assess whether their employment practices comport with Title VII's requirements. As of today, however, employers in this Circuit no longer have that assurance that their scrupulous adherence to the four-fifths rule will insulate them from an adverse impact suit. The Majority's opinion opens the door for plaintiffs to file a Title VII suit based on the newest statistical flavor of the month, but provides absolutely no guidance as to which tests are to be used in assessing whether an employment practice results in an adverse impact, how any tests are to be applied, or how to determine their statistical significance.

Even considering the alternative statistical evidence that the Majority relies on, the disparity between the scores of white and African-American applicants, while statistically significant, does not rise to the level of a Title VII infraction. In *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977, 994-95 (1988) the Supreme Court indicated that a disparity must be substantial: "[o]ur formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation." The Court in *Albemarle Paper Co. v. Moody* stated that, to establish an adverse impact, the complaining party must show "that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." 422 U.S. 405, 425 (1975). In the case at bar, 98 out of the 120 applicants (81.7%) passed the City's test when a cut-off score of 66 was imposed; 51 out of 57 (89.5%) whites and 47 out of 63 (74.6%) African-Americans passed. I do not think that this small disparity is significant in "practical terms," *see* 29 C.F.R. § 1607.4(d) ("Smaller differences in selection rate may nonetheless constitute adverse impact, where they are significant in both statistical and practical terms . . .") and therefore, I do not believe it is cognizable under Title VII. What's more, there is absolutely nothing in the record to suggest that the City purposefully discriminated against African-Americans or ignored a risk that the written test would cause an adverse impact. To the contrary, the City retained an industrial psychologist to create a test that would not cause an adverse impact and even lowered the cut-off score to ensure that more racial minorities, who otherwise would have not passed the test, remained in consideration for promotion to lieutenant.

Accordingly, I would reverse the decision of the district court because the Appellees have failed to show that the City's use of a cut-off score created an adverse impact in violation of Title VII.

---

[1]Despite the fact that the Majority notes that *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 656-57 (1989) "did not say what kind of statistical evidence should be relied on," it argues that *Wards Cove* "impl[ies] that other statistical analyses may be considered." Even assuming that it supports this proposition, *Wards Cove* does not "offset" *Black*'s holding. As in *City of Mansfield*, the Court in *Wards Cove* held that the plaintiffs' statistical evidence did not establish a disparate impact in violation of Title VII. 490 U.S. at 661. *Wards Cove* is not a case where the Court relied on alternative statistical analyses to find an adverse impact when the four-fifths rule was otherwise satisfied.