NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0319n.06
Filed: May 5, 2009

Case No. 07-3515

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| WILLIE S. PHILLIPS, et. al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| ROBERT GATES, SECRETARY OF THE | ) | DISTRICT OF OHIO |
| DEPARTMENT OF DEFENSE, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

BEFORE: MARTIN, BATCHELDER, and DAUGHTREY, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge. Appellants are African-American current and

former employees of the Defense Finance and Accounting Service in Columbus, Ohio ("DFAS-

CO"), an independent agency within the federal Department of Defense ("DOD"). They claim that

DFAS-CO's promotion policies disparately impacted them on account of their race. Following a

bench trial, the magistrate judge ruled in favor of the Secretary of Defense ("Secretary"). For the

reasons that follow, we affirm.

I.

1

DFAS-CO's main function is to pay the DOD's vendors and contractors; it also issues disbursements and provides accounting services for smaller agencies within the DOD. DFAS-CO was created in 1991 to consolidate the work of several regional offices. The DOD sought to recruit employees from these offices to come to the new center in Columbus, but fewer than 10% of the employees agreed to transfer. A significant percentage of the employees who did transfer were African-American.

From 1991 to 1995 the DFAS-CO workforce expanded from 400-500 employees to 3,500 employees. This increase featured rapid hiring (an average of 70 new hires per month) and numerous opportunities for promotions. Because only a small number of employees transferred from other offices, most of the hires were "off the street" — of people from the Columbus area. Some African-American DFAS-CO employees perceived that many of the newly-hired white employees were being promoted at a faster rate than they were, despite the African-American employees' seniority. These African-American employees also perceived that they had been subject to more disciplinary actions and had received fewer awards than white employees, that promotions were made on the basis of personal friendships and connections, and that supervisors engaged in pre-selection — all of which, they felt, limited African-American employees' opportunities for promotions.

In response to employees' complaints about the promotions process, the directors of DFAS-CO organized a Process Action Team ("PAT") to investigate the allegations. This team, which included DFAS-CO employees and two outside consultants, was to address specific issues: (1) whether only non-minorities were advancing to the GS-11 pay grade and above; (2) whether pre-selection of jobs existed; (3) whether management selection patterns were discriminatory; and (4)

2

whether personal relationships were impacting selections and promotions. In its investigation, the team interviewed 25% of the DFAS-CO workforce and analyzed promotions and Equal Employment Opportunity ("EEO") statistical data for the years 1995 and 1996. The interviewed employees included both randomly selected workers and volunteers.

In March 1997, the team released a report ("the PAT report") finding that: (1) minorities were promoted at lower rates than non-minorities, especially at higher grade levels; (2) several groups, especially African-American men, were under-represented at higher grade levels; (3) evaluation of application content was subjective; (4) there existed a strong perception that discrimination, whether race-based or not, existed at DFAS-CO; (5) management may have committed a prohibited personnel practice in the case of a particular white employee; (6) white women received 72% of the exceptional performance ratings in 1995; (7) supervisors rated employees within their own race or national origin more highly than employees from other groups; and (8) selecting officials who were white men showed strong, ethnic preferences in awarding promotions.

Following the release of the PAT report, Appellant Willie Phillips filed a discrimination complaint with DFAS-CO's EEO office. After an investigation, the EEO office issued its own report in which it found, among other things, that African-American employees received about 22% of all promotions in 1995-1996, which reflected the approximate percentage of African-American employees in the DFAS-CO workforce during that period. An administrative judge subsequently dismissed the complaint.

The Appellants then filed suit, alleging that the Secretary's practices and procedures regarding employee promotions had a disparate impact on African-American employees in violation

3

of Title VII. The district court granted summary judgment in favor of the Secretary on the ground that Appellants had failed to file a timely administrative complaint. We reversed, finding that equitable tolling applied. *Phillips v. Cohen*, 3 F. App'x 212 (6th Cir. 2001) ("*Phillips I*").

On remand, the district court referred the case to a magistrate judge, who entered summary judgment for the Secretary — this time on the grounds that Appellants had not produced any evidence of a disparate impact or traced the alleged impact to any of the Secretary's policies. We again held in favor of Appellants, finding that there remained for trial a material issue of fact regarding the existence of a disparate impact. *Phillips v. Cohen*, 400 F.3d 388 (6th Cir. 2005) ("*Phillips II*"). We also held that the magistrate judge had failed both to assess the quality of evidence that had been lost by Appellee, or, in violation of a court order, routinely destroyed pursuant to the agency's internal regulations, and to determine appropriate sanctions.

On further remand, the magistrate judge conducted a bench trial and found that Appellants had failed to prove a disparate impact by a preponderance of the evidence. The magistrate judge also evaluated the quality of the lost evidence and determined that the loss did not negatively impact Appellants' case; the judge did, however, award Appellants attorney's fees and costs incurred in connection with their motion for sanctions. This appeal followed.

## II.

Appellants raise several arguments on appeal. First, they contend that the trial court erred in finding that they had failed to prove a disparate impact by a preponderance of the evidence. Second, they argue that the trial court did not sanction the Secretary harshly enough for failing to preserve evidence. Finally, they maintain that the court erroneously dismissed Plaintiff-Appellant Todd Brooks.

4

**A.**

"This Court's standard of review in a Title VII discrimination case is 'narrow.'" *Dunlap v. TVA*, 519 F.3d 626, 629 (6th Cir. 2008) (quoting *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005)). In a disparate impact case, a trial court's findings of fact should stand unless clearly erroneous. *Id.* "The issue is not whether the [trial] court reached the best conclusion, but whether the evidence before the court supported the [trial] court's findings." *Id.* (citation omitted). "Also, the [trial] court's findings based on the credibility of the witnesses before it are entitled to great deference on appeal." *Id.* (citation omitted).

To succeed with a disparate-impact claim, a plaintiff must first "establish a prima facie case of discrimination — i.e., the plaintiff must establish that an adverse impact has occurred." *Id.* "If he succeeds, the employer must show that the protocol in question has 'a manifest relationship to the employment' — the so-called 'business necessity' justification." *Id.* (quoting *Griggs v. Duke Power*, 401 U.S. 424, 431 (1971)). "The plaintiff must then show that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect." *Id.* (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 432 (1975)).

To establish a prima facie case, the plaintiff must challenge a specific employment practice and prove, through relevant statistical analysis, that the challenged practice has an adverse impact on a protected group. *Id.* (citing *Johnson v. U.S. Dep't of Health and Human Servs.*, 30 F.3d 45, 48 (6th Cir. 1994)). The prima facie case is sometimes said to comprise three elements — identification, disparate impact, and causation. *See, e.g., EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 601 (1st Cir. 1995). If, however, "the employee challenges the employer's promotion process as a whole . . . then the disparate impact and causation elements merge." *Phillips*

5

*II*, 400 F.3d at 397-98 n.8. Accepting *arguendo* Appellants' argument that the DFAS-CO promotion practices are incapable of separation,[1] we consider the disparate-impact and causation elements to address the same question: "whether the evidence in the record supported a finding that African-American employees were promoted at a lower rate than white employees." *Id.*

"In cases involving promotion policies, the relevant inquiry is comparing the number of protected group members benefitting from promotions with the number seeking them; this figure is then contrasted with the corresponding ratio for the non-protected group." *Id.* at 399 (citing *Connecticut v. Teal*, 457 U.S. 440, 448 (1982)). "[S]tatistics based on an applicant pool containing individuals lacking minimal qualifications for the job would be of little probative value," however. *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 997 (1988) (citations omitted). And while "sufficiently substantial" statistical disparities raise an inference of disparate impact, the relevant analysis should not be "framed in terms of any rigid mathematical formula." *Id.* at 994-95.

Ideally, to determine if African-American employees were promoted at a lower rate than their white counterparts, one would compare the respective ratios of promoted African-American and white employees to the number of qualified African-American and white applicants. The parties could not make this comparison here, however, because under the DFAS-CO document retention policy, applicant flow data was destroyed every two years, on a rolling basis. By the time Appellants filed their complaint in October 1998, only data for 1997 and part of 1996 existed.

---

[1] In the second appeal in this litigation, we noted that Appellee did not challenge the magistrate judge's finding that DFAS-CO's promotion process "should be considered as a whole" or Appellant's argument that the process was "incapable of separation." *Phillips II*, 400 F.3d at 397-98. The Secretary does not argue before us that the promotion process should be analyzed on a piecemeal basis.

In an attempt to reconstruct the relevant ratios, Appellants and the Secretary presented statistical experts who employed different methods. Appellants' expert, Dr. Ramona Paetzold, compared the racial composition of all promoted employees to the racial composition of the entire DFAS-CO workforce. This method assumed that every DFAS-CO employee applied for every job opening, irrespective of whether the employee would, in fact, be qualified, unqualified, or overqualified for the position. Dr. Paetzold thus based her statistical analysis on an applicant pool that necessarily included "individuals lacking minimal qualifications." *See Watson*, 487 U.S. at 997. Dr. Paetzold determined that African-American employees were promoted at a significantly lower rate than were white employees.

The Secretary's expert, Dr. John Claudy, created "constructed pools" of applicants for each promotion. Dr. Claudy examined employee grades in pairs of successive years to determine when promotions had occurred. For example, if an employee was listed as a grade GS-7 in 1995 but as a grade GS-8 in 1996, then Dr. Claudy assumed that a promotion had taken place. For each promotion, Dr. Claudy constructed a pool of employees in the same (pre-promotion) grade level and job series as the successful applicant. This method had the advantage of using an applicant pool that was more likely to approximate the group of employees who were qualified for and actually applied for a given promotion. It was nonetheless flawed in that it failed to account for the fact that sometimes employees could qualify for and would apply for promotions outside of their job series. Dr. Claudy determined that: in some grade levels African-Americans were promoted at a rate higher than would be expected, in other grade levels African-Americans were promoted at a rate lower than would be expected; and in only one grade level (Grade 5) were African-Americans promoted at a rate lower than two standard deviations from what would be expected.

The magistrate judge noted the flaws with both approaches, found that the experts' conclusions stood in equipoise, and determined that Appellants had failed to show a disparate impact by a preponderance of the evidence. The magistrate judge further found that the PAT report did not prove a disparity in promotion rates between African-Americans and whites because the report compared the percentage of African-American employees receiving promotions at DFAS-CO to the percentage of African-American employees in the Columbus labor force. The PAT report did not account for minimal qualifications for the promotions, nor did it purport to analyze the alleged disparity in terms of standard deviations. As for the EEO report, the magistrate judge determined that its findings were skewed because its survey sample was not entirely random but included a disproportionate number of African-American respondents. Finally, the magistrate judge found that Appellants' testimony did not establish a disparate impact because the individual witnesses testified only that they were denied promotions for which they applied and for which they believed themselves to be qualified. They did not establish that they were denied the promotions on account of their race, and their anecdotal evidence did not prove a significant difference in the promotion rates between whites and African-Americans at DFAS-CO.

The magistrate judge's findings are not clearly erroneous. Although Appellants argue that "[t]he trial court erred in finding Dr. Claudy's expert opinion as credible and trustworthy as Dr. Paetzold's," it might be better said that the magistrate judge found both expert opinions equally problematic. He therefore accepted neither expert's analysis, and concluded that Appellants had not carried their burden. Although the PAT report, the EEO report, and Appellants' testimony provided some evidence of a perceived race-based disparity at DFAS-CO, the evidence was not sufficient to

8

require a finding that Appellants had demonstrated the type of statistical disparity necessary to establish a Title VII prima face case.

**B.**

"We review a district court's imposition of sanctions for abuse of discretion." *Fieger v. Cox*, 524 F.3d 770, 774 (6th Cir. 2008) (quoting *Frank v. D'Ambrosi*, 4 F.3d 1378, 1387 (6th Cir. 1993) (citing in turn *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 399 (1990))).

On December 18, 1998, the district court issued a retention order that required DFAS-CO to preserve existing records related to this litigation. By that time, however, DFAS-CO already had destroyed almost all of the applicant flow data for the years 1996 and earlier because its document-retention policy called for such materials to be destroyed on a two-year, rolling basis. Thomas Gary, head of Togar and Associates, the outside consultant that assisted DFAS-CO with the PAT report, testified that he took with him two boxes of materials used in the creation of the PAT report. These materials would have included only data for the years 1995-1996 and likely did not include all applicant flow data even from that period. Gary testified that in late 1997 or early 1998 he sent the boxes to DFAS-CO headquarters in Arlington, Virginia. The magistrate judge held that if DFAS-CO had taken steps to look for those materials immediately after the district court's order, DFAS-CO might have been able to locate the PAT documents. The magistrate judge granted Appellants attorney's fees and costs incurred in pursuing their motion for sanctions.

Appellants claim that this sanction was not enough and that the magistrate judge should have "lowered the bar" on differences in the promotion rate or allowed an inference of adverse impact pursuant to 29 C.F.R. § 1607.4(D). That regulation provides in part:

9

> Where the user has not maintained data on adverse impact as required by the documentation section of applicable guidelines, the Federal enforcement agencies may draw an inference of adverse impact of the selection process from the failure of the user to maintain such data, if the user has an underutilization of a group in the job category, as compared to the group's representation in the relevant labor market or, in the case of jobs filled from within, the applicable work force.

Nothing in this regulation requires federal judges to impose any particular sanction on an entity that has failed to preserve records that may bear on adverse employment impacts. It permits, but does not require, federal enforcement agencies to draw inferences. It does not abrogate the discretion trial judges have in imposing appropriate sanctions. Moreover, both statistical experts at trial testified that the data from the PAT investigation would not have substantially altered their analyses because it would only have included a sample of information from a two-year period and would not have helped to establish promotion rates for the total period in question. We find no abuse of discretion here.

## C.

We review for abuse of discretion a trial court's decision to dismiss a party. *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 612 (6th Cir. 2003); *see* FED. R. CIV. PRO. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."). We therefore "affirm the dismissal of a party for misjoinder unless this court is left with a definite and firm conviction that the trial court committed a clear error of judgment." *Sutherland*, 344 F.3d at 612 (citation and internal quotation marks omitted).

The magistrate judge dismissed Plaintiff-Appellant Todd Brooks because he was unable to be physically present at trial. Appellants argue that Brooks's individual testimony was unnecessary because it would have been "cumulative and redundant": he, like all the other plaintiffs, would have

testified that he was denied promotions for which he was qualified and that he believed those denials were racially-based. His testimony, Appellants insist, would have been required only if the trial had proceeded to the damages phase.

This argument is without merit. Although Brooks most likely would have testified to being denied promotions in much the same way as the other plaintiffs allegedly were, his testimony would not for that reason have been "cumulative" or "redundant." As a plaintiff in this action, Brooks was required to prove that DFAS-CO's allegedly discriminatory promotions policy injured him in some way. Whether Brooks was denied promotions for which he was qualified was an issue of fact for determination in the trial's liability phase.

Appellants further argue that instead of dismissing Brooks, the trial court should have admitted his affidavit into evidence. Quoting *McIntyre v. Reynolds Metals Co.*, 468 F.2d 1092, 1094 (5th Cir. 1972), Appellants maintain that the affidavit would not have been inadmissible hearsay because "[w]hen a witness . . . affirms the truth of a prior statement, the earlier statement is to be considered not only as bearing on the credibility of the witness but also as affirmative evidence." *McIntyre*, however, addressed a situation where a deposition witness explicitly affirmed a prior statement, and opposing counsel had the opportunity at the deposition to cross-examine the witness regarding the statement. Here, the Secretary never had the opportunity to cross-examine Brooks about the statements in his affidavit. Appellants argue that the Secretary could have deposed Brooks if he had wished, but this argument misses the mark — a defendant does not waive a hearsay objection by waiting to confront a plaintiff at trial. The magistrate judge did not abuse his discretion in dismissing Brooks.

**CONCLUSION**

11

Accordingly, this Court **AFFIRMS** the judgment of the district court.