RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0121p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DAVID DUNLAP,

　　　　　　*Plaintiff-Appellee,*

　　　*v.*

TENNESSEE VALLEY AUTHORITY,

　　　　　　*Defendant-Appellant.*

No. 07-5381

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00045—William J. Haynes, Jr., District Judge.

Argued: February 6, 2008

Decided and Filed: March 21, 2008

Before: MARTIN and SUTTON, Circuit Judges; OBERDORFER, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Edwin W. Small, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellant. Debra A. Wall, Clarksville, Tennessee, for Appellee. **ON BRIEF:** Edwin W. Small, John E. Slater, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellant. Debra A. Wall, Clarksville, Tennessee, for Appellee.

_____

**OPINION**

_____

BOYCE F. MARTIN, JR., Circuit Judge. David Dunlap brought suit under Title VII of the Civil Rights Act of 1964, alleging racial discrimination by the Tennessee Valley Authority. The district court found that Dunlap had been subjected to discrimination under both disparate treatment and disparate impact analyses, concluding that the TVA's subjective hiring processes permitted racial bias against both Dunlap and other black job applicants. The TVA now appeals, arguing that the district court erred in each of these analyses. We find that although the district court was correct in finding disparate treatment, the proof was insufficient for a finding of disparate impact. We therefore AFFIRM on the disparate treatment claim, REVERSE on the disparate impact claim, and AFFIRM the court's award of damages and fees.

---

[*] The Honorable Louis F. Oberdorfer, Senior United States District Judge for the District of Columbia, sitting by designation.

1

I.

David Dunlap is a fifty-two year-old black man who has worked as a boilermaker for twenty years, including nearly fifteen years' experience as a boilermaker foreman responsible for a crew of boilermakers. Most of Dunlap's experience has been with Tennessee Valley Authority (TVA) facilities located across Tennessee through contract or temporary work with his union. Dunlap asserts that he has tried to gain employment with the TVA since the 1970s, but had never been offered a job, or even an interview. For the boilermaker position at issue, Dunlap submitted his resume and application before the application deadline. His materials specified his work with TVA facilities, his boilermaker training (through the TVA's own training program), his supervisory experience, and his 27,000 hours of experience in the field.

Of the twenty-one people interviewed for the ten positions available,[1] all were referred by the local boilermaker union as being qualified for the job, including Dunlap. The selection committee at the Cumberland facility, where the job openings were located, was comprised of five white officials and one black official. Participants were asked a combination of technical questions, developed by committee members with boilermaker experience, and non-technical questions, developed by other management and human resources employees. Sometime before the interviews began, the selection committee determined that the interview would account for seventy percent of an applicant's final score and technical expertise would account for thirty percent. After each interview, the committee reviewed the individual score sheets as a group in an effort to even out the scores. This "score-balancing" caused the final scores to vary widely from the initial scores, even on basic, objective questions such as an applicant's safety record or attendance history. For example, when Dunlap reported that his attendance record was excellent with only a few days off for family illness, he received a score of 3.7. In contrast, when two white applicants gave essentially the same answer, they received a 4.2 and a 5.5. For Dunlap's perfect safety record, he received a 4, while another applicant who had had two accidents in eleven years received a score of 6. Dunlap alleges that although these are the most egregious examples of bias, the entire interview was similarly infected.

After the interviews, the twenty-one applicants were ranked in order of most to least qualified. The selection committee then divided the applicants into three groups: outstanding, well-qualified, and qualified. The ten applicants in the "outstanding" category were all chosen for jobs. Dunlap's scores placed him in fourteenth place. Of the ten people chosen, one was William Parchman, an African-American veteran[2] with thirty years of experience as a boilermaker. Parchman provided testimony that he too had a history of being rejected for jobs at the TVA, and received the boilermaker position at issue after filing a complaint with the Equal Employment Opportunity Commission (EEOC).

Dunlap alleges that the combined weight of his more than twenty years of technical and supervisory experience made him a more qualified applicant than some of the other applicants who were hired, some of whom had only minimal supervisory experience or poorer safety records. Dunlap's score on the technical part of the application equaled that of five of the selected candidates, yet he scored much lower on the interview and was thus not selected. He alleges that the interview process was biased from the beginning to select less qualified candidates, some with family

---

[1] Eight boilermaker positions were initially available, and two more opened up before the end of the selection process.

[2] Veterans were entitled to special hiring preferences pursuant to TVA policy.

affiliations to the committee members,[3] by hiding racial preferences.  After a bench trial, the district court found that the TVA's interview matrix process had been manipulated to exclude black applicants who were better qualified than the white applicants selected for full-time jobs at the plant, and that Dunlap himself was subjected to disparate treatment in his interview.  The district court awarded Dunlap back pay, transportation expenses, compensatory damages, and attorney's fees.  Defendant TVA now appeals, arguing that the district court's findings of disparate impact and disparate treatment discrimination were clearly erroneous.

## II.

This Court's standard of review in a Title VII discrimination case is "narrow."  *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005).  Under Federal Rule of Civil Procedure 52(a), a district court's findings of fact should not be reversed unless clearly erroneous.  *Zamlen v. City of Cleveland*, 906 F.2d 209, 217 (6th Cir. 1990).  Clear error will lie only when the reviewing court is left with the definite, firm conviction that a mistake has been made.  *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).  The issue is not whether the district court reached the best conclusion, but whether the evidence before the court supported the district court's findings.  *Heights Cmty. Congress v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985).  Also, the district court's findings based on the credibility of the witnesses before it are entitled to great deference on appeal.  *Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 543 (6th Cir. 1989).

Title VII prohibits employment practices that are "fair in form but discriminatory in operation."  *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).  Discrimination occurs when an employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity. . . ."  42 U.S.C. § 2000e-2(k)(1)(A)(I).  Two theories are available to a plaintiff under current law to prove a case of unlawful employment discrimination: disparate treatment and disparate impact.  *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1257 (6th Cir. 1981).  Dunlap relies on both theories to prove he was discriminated against by the TVA.

### 1) Disparate impact

The disparate impact theory requires a plaintiff to demonstrate that a facially neutral employment practice falls more harshly on one group than another and that the practice is not justified by business necessity.  *Rowe v. Cleveland Pneumatic Co.*, 690 F.2d 88, 92 (6th Cir. 1982).  Under this theory, proof of discriminatory intent is not required.  *Griggs v. Duke Power Co.*, 401 U.S. at 432.  The Supreme Court has devised a three-part burden-shifting test to determine whether an unlawful disparate impact exists in a particular case.  *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975).  First, the plaintiff must establish a prima facie case of discrimination – i.e., the plaintiff must establish that an adverse impact has occurred.  If he succeeds, the employer must show that the protocol in question has "a manifest relationship to the employment" – the so-called "business necessity" justification.  *Griggs*, 401 U.S. at 431.  The plaintiff must then show that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect.  *Albemarle*, 422 U.S. at 425, 432.

A prima face case is established when: (1) the plaintiff identifies a specific employment practice to be challenged; and (2) through relevant statistical analysis proves that the challenged practice has an adverse impact on a protected group.  *Johnson v. U.S. Dep't of Health and Human*

---

[3] Three of the selected candidates had less boilermaker experience than Dunlap, but had family connections to TVA managers or employees.

*Servs.*, 30 F.3d 45, 48 (6th Cir. 1994) (citing *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 907-08 (6th Cir. 1991)).  The parties disagree about which employment practice Dunlap presented for review before the district court; namely, whether it was the interview process used by the entire TVA over a number of years, or simply the interview process that was used for the Cumberland facility boilermaker positions in early 2000.  From the record, it appears that it was only the latter. No proof was introduced at trial about TVA-wide hiring practices, and the district court's opinion identifies only the Cumberland committee's questions and scoring of the applications during Dunlap's interview process.  Moreover, Dunlap's expert, William Anthony, testified about the lack of standards during Dunlap's interview only, and produced a report whose scope addresses only the "policies and procedures in the promotion decision involving Mr. Dunlap."  Joint App'x at 328. Dunlap did not present evidence that the practices used in his interview were ever used for other hiring decisions, so no statistical proof can show that a protected group was adversely impacted. We therefore conclude that Dunlap challenged only the process used in his own interview, and the district court clearly erred in finding a prima facie case of disparate impact.  *See Wright v. Nat'l Archives & Records Serv.*, 609 F.2d 702, 711-12 (4th Cir. 1979).

### 2) Disparate treatment

The disparate treatment doctrine, articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), requires a plaintiff to demonstrate that an employer has treated some people less favorably than others because of their race, color, religion, sex or national origin.  On appeal from a bench trial, we consider whether the plaintiff has met his burden of proving the ultimate "factual inquiry" in a Title VII case: "whether the defendant intentionally discriminated against the plaintiff." *U.S. Postal Serv. v. Aikens*, 460 U.S. 711, 715 (1983); *see also Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720-21 (6th Cir. 2004).  In doing so, we may take into account the evidence that the parties presented to meet their burdens of production under the *McDonnell Douglas* framework.  Under that framework, (1) the plaintiff must establish a prima facie case of racial discrimination; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was in fact pretextual.  *Harrison v. Metro. Gov't of Nashville and Davidson County*, 80 F.3d 1107, 1115 (6th Cir. 1996).  Under a disparate treatment theory, "proof of discriminatory motive is critical. However, in some cases it may be inferred from the mere fact of differences in treatment." *Rowe*, 690 F.2d at 92.  Proof of discriminatory motive may also be inferred from the falsity of the employer's explanation for the treatment.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000).

The burden of establishing a prima facie case of disparate treatment is not onerous.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (U.S. 1981).  A plaintiff may establish a prima facie case of discrimination by showing (1) that he is a member of a protected group, (2) that he was qualified for the position at issue, and (3) that he was treated differently than comparable employees outside of the protected class. *See McDonnell-Douglas*, 411 U.S. at 802; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).  The district court found that Dunlap established each of these factors by showing that (1) Dunlap is African-American, (2) he was qualified for the job, and (3) white applicants with less experience were hired for the boilermaker positions. The district court did not clearly err in this determination.

To rebut a prima facie case, a defendant must articulate a legitimate nondiscriminatory reason for the plaintiff's rejection.  *Burdine*, 450 U.S. at 254-56.[4]  In this case, TVA presented the selection matrix used during Dunlap's interview, and showed that his interview scores did not place his final scores into the top ten.

---

[4] Despite TVA's assertions to the contrary, the district court did correctly identify that "the defendant's burden is for the production of evidence, not the burden of persuasion."  Joint App'x at 33 (citing *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989)).

The burden then shifted back to Dunlap to prove that the matrix process was pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 804-05. "There are no hard and fast rules as to . . . what evidence is needed in order to establish a pretext." *Rowe*, 690 F.2d at 97; *see also Heights Cmty.*, 774 F.2d at 140 ("the test is whether there is evidence in the record to support the lower court's finding, and whether its construction of that evidence is a reasonable one."). The district court found that Dunlap successfully showed pretext by demonstrating that his matrix score was manipulated to keep him out of the top ten applicants. Evidence before the district court showed that the assigned weight given to the interview was changed by the questioners to favor a more subjective process, interview questions were not objectively evaluated, and scores were altered to produce a racially biased result. The district court was therefore not clearly erroneous in finding that Dunlap's matrix score was used in a pretextual way.

First, the selection committee determined that the interview would account for seventy percent of an applicant's final score, and technical expertise would account for thirty percent, therefore transferring the bulk of the final score from an objective measurement (merit and experience) towards a subjective measurement (communication skills). The TVA's "Principles and Practices" on filling vacant positions, however, mandate that "merit and efficiency form the basis for selection of job candidates," stating that "education, training, experience, ability and previous work performance serve as a basis for appraisal of merit and efficiency." Joint App'x at 337.

During the interview, the scores varied widely even on seemingly objective questions. Dunlap reported that his attendance record was excellent with only a few days off for family illness and received a score of 3.7. In contrast, when two white applicants gave essentially the same answer, they received a 4.2 and a 5.5. For Dunlap's perfect safety record, he received a 4, while another applicant who had had two accidents in eleven years received a score of 6. Points were also awarded for politeness in answering the first interview question, with an extra half-point awarded for answering "yes, ma'am."

After the interview, the "score balancing" process seems to have been manipulated, again in contravention of TVA policy. The district court found that some of the score sheets were changed as many as seventy times, and there is no evidence of legitimate reasons to support such revisions. An email from the human resources director of the Cumberland plant explicitly states that interviewers should not award points for being a "diversity candidate," so there is no argument that TVA manipulated scores to ensure diversity. (If anything, evidence that a manager may have "talked [with the team] about who was a diversity candidate," Joint App'x at 842, supports an argument that TVA manipulated scores to select one, and only one, diversity candidate.) Furthermore, the email emphasizes, "it is really important up front before your interviews start[] to have a definition of what 'Outstanding,' 'Well-Qualified,' and 'Qualified' is. This needs to be documented and dated before the interview process starts." Joint App'x at 297. The district court found, however, that the interviewers placed candidates into these categories after the interviews were finished and after the candidates had been ranked, ensuring that the number of "outstanding" applicants equaled exactly the number of job openings. Because of these irregularities, the hiring matrix score offered by TVA as a legitimate reason for Dunlap's rejection cannot be relied upon.

Finally, the district court evaluated the credibility of TVA's witnesses, a determination to which we afford vast deference. *Wooldridge*, 875 F.2d at 543. Most notably, the court evaluated the credibility of Rosanne Sietins, TVA's Human Resources representative on the selection committee, and Leonard Hancock, the Cumberland plant manager who had final authority on hiring at the plant and oversaw Dunlap's interview process. The court concluded that discrimination motivated the committee's decision-making, and we do not find clear error in that determination.

Once a proffered reason is found to be pretextual, a court may infer the ultimate fact of intentional discrimination. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 347 (6th Cir. 1997). Here, there was ample evidence supporting the district court's finding of pretext, including the contravention of TVA rules on conducting interviews and measuring candidate merit, and the ultimate manipulation of the matrix scores. Considering all of the evidence, the district court found that TVA used the selection process "to mask [TVA's] preferential hiring process" and "to select one black applicant that would satisfy the TVA central management." Dist. Ct. Op. at 20. Therefore the district court's finding of intentional discrimination was not clearly erroneous.

TVA's final argument on the disparate treatment claim is that Dunlap has failed to prove causation. It argues that disputed questions, particularly about attendance and safety, could have been taken out of the matrix and Dunlap still would not have won the job based on his final score. In this Circuit, however, proof of a strict "causal connection" is not a separate element of the *McDonnell Douglas* burden-shifting framework. *See Hollins v. Atlantic Co.*, 188 F.3d 652, 659 (6th Cir. 1999) ("The ultimate question of causation is subsumed by the final stage of the burden-shifting analysis"); *see also Hale v. Cuyahoga County Welfare Dept.*, 891 F.2d 604, 606 (6th Cir. 1989) ("the 'causal connection' step generally is met simply by showing that the position in question was awarded to a member of [an unprotected class]"). Moreover, Dunlap's claim is not that specific interview questions were discriminatory. His claim is that the entire hiring process hid unlawful racial discrimination against him. The district court credited this claim, and made no reversible error in doing so.

### III.

Although the proof at trial was insufficient for a finding of disparate impact, the district court committed no error in finding disparate treatment discrimination. Thus, we AFFIRM on the disparate treatment claim, REVERSE on the disparate impact claim, and AFFIRM the court's award of damages and fees.