**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0594n.06

No. 11-1704

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Jun 07, 2012*
LEONARD GREEN, Clerk

LORENZO PORTER LOTT,           )
                               )
    **Plaintiff-Appellant,**   )          ON APPEAL FROM THE
                               )          UNITED STATES DISTRICT
v.                             )          COURT FOR THE EASTERN
                               )          DISTRICT OF MICHIGAN
ICS MERRILL,                   )
                               )
    **Defendant-Appellee.**    )          **O P I N I O N**
                               )
_____)

Before:  MOORE, SUTTON, and STRANCH, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  Lorenzo Porter Lott ("Lott") appeals from

a district court order granting summary judgment in favor of his former employer, ICS Merrill, on

Lott's claims of racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964,

as amended, 42 U.S.C. §§ 2000e-2 and 2000e-3.  Lott has appealed only the grant of summary

judgment against his racial discrimination claim.  For the following reasons, we **REVERSE** the

district court's decision.

**I.  BACKGROUND**

Lott, an African American male, began working for ICS Merrill in July 2006 as a field

investigator.  ICS Merrill, a division of Examination Management Services, Inc. ("EMSI"), assists

other companies in investigating insurance claims.  Field investigators are tasked with conducting

video surveillance of individual claimants in a particular region.  Lott was assigned to work in

Detroit, Michigan. Lott's initial case manager was Scott Halpin, who was replaced by Jason Gay in March 2008. Lott's regional manager since October 2007 was Chatoya Shelton ("Shelton"). Lott worked at ICS Merrill until his termination on May 12, 2008.

Lott claims that throughout his employment at ICS Merrill, he was treated differently from similarly situated white field investigators because (1) he never received certain pay raises, (2) his hours were cut severely, and (3) he was intentionally assigned certain difficult cases known as "no movement" cases, all as a pretext to harm his performance and justify his termination on the basis of his race. R. 1 (Compl. at ¶¶ 14-16, 20-22, 24-27, 32-33). The Equal Opportunity Employment Commission issued Lott a right to sue letter for both racial discrimination and retaliation, and Lott filed a complaint in the United States District Court for the Eastern District of Michigan alleging that he was wrongfully discriminated against on the basis of his race and that he was wrongfully terminated in retaliation for having complained about ICS Merrill's discriminatory practices, both in violation of Title VII of the Civil Rights Act of 1964. *Id.* at ¶¶ 36-46.

ICS Merrill moved for summary judgment on the basis that Lott had failed to make out a prima facie case of racial discrimination or retaliation. ICS Merrill argued that Lott was fired not because of his race but because of deficient performance and that Lott had not offered sufficient evidence that he was treated differently from anyone because of his race. ICS Merrill concedes that Lott's employment was "satisfactory" until November 2007. Appellee Br. at 4. The problems from ICS Merrill's perspective began in November 2007 when Lott supposedly told the company that he would no longer accept assignments outside of the immediate Detroit area due to his car troubles.

2

R. 26-4, Ex.C (Shelton Aff. at ¶¶ 7-8). As a result of this request, Shelton explained that Lott was given fewer surveillance assignments. *Id.* at ¶¶ 9-10. Thereafter, ICS Merrill claims that Lott continuously began to submit late reports despite reminders from the corporate trainer, Jason Hunt, to turn them in on time. R. 26-5, Ex. D (Hunt Emails); R. 26-6, Ex. E (3/5/08 Hunt Email). On March 7, 2008, Shelton claims that Lott was verbally warned and issued a "Performance Correction Notice" because Lott had failed to respond to Hunt's emails. R. 26-4, Ex.C (Shelton Aff. at ¶ 13); R. 26-7, Ex. F (3/7/08 Notice).

Shelton then looked up Lott's video percentage on his surveillance cases and determined that he had an average of only 8% since the beginning of 2008, the second lowest in the company and much lower than the 55% average Shelton claims that the employees were instructed to maintain. R. 26-4, Ex. C (Shelton Aff. at ¶¶ 14-16).[1] Shelton advised Lott on March 17, 2008, in a written warning, that his video percentage was unacceptable and that because of his low percentage and his failure to timely submit results he would be placed on a ninety-day probation. R. 26-8, Ex. G (3/17/08 Notice & Email). ICS Merrill concedes that during the next two months, Lott's video average increased to 20%, Appellee Br. at 9, and that Shelton made the decision to terminate Lott on May 12, 2008, before the end of his probation. R. 26-4, Ex. C (Shelton Aff. at ¶ 18); R. 26-11, Ex. J (Separation Doc.). ICS Merrill denied ever giving Lott "no movement" cases and stated that

[1] A field investigator's "video percentage" is the percentage of cases in which the investigator is able to capture the subject on video. Appellee Br. at 3.

it was impossible to determine in advance whether any given case would yield video of the subject. R. 26-4, Ex. C (Shelton Aff. at ¶ 11).

From Lott's perspective, the problems also began in the fall of 2007 when Shelton became his regional manager. Lott told ICS Merrill about his car troubles but denied ever saying he could not take certain assignments as a result. R. 26-3, Ex. B (Lott Dep. at 173-75, 180, 194). He testified that he was still fully able to take all assignments during that time, *id.* at 174, and he presented an affidavit from his girlfriend confirming that he had complete access to a car at all times, R. 27-5 (Baker Aff. at ¶¶ 5-8). Lott did not remember most of the emails from Jason Hunt and disputed that he ever turned in any report late, with one exception in March 2008, which he conceded he sent after the 24-hour internal deadline but still sent to the client on time. R. 26-3, Ex. B (Lott Dep. at 243, 249, 252, 320-21). Lott believed that Hunt's emails reflected Hunt's own inability to find the reports on the system, not any tardiness by Lott. *Id.* at 233-34, 252, 258.[2] Lott acknowledged a call from Shelton on March 7, which he described as verbally abusive in which she swore at him but never identified any failure to follow a particular policy. *Id.* at 271-73, 283. He acknowledged receiving the notice on March 17, which he refused to sign because he had never been previously warned of any problems in his performance. Lott disputes ever being told that field investigators were required to maintain a minimum video percentage of 55% and attributes his low percentage to a lack of good

---

[2]Lott further explained that Jason Hunt was not his vendor manager on the majority of his assignments. When questioned about the emails from Hunt, Lott did not understand why Hunt was asking for the reports when Lott had already sent the report to his actual vendor manager. R. 26-3, Ex. B (Lott Dep. at 230). Lott could only speculate that Hunt did not have access to the system or simply did not look. *Id.* at 233-34.

cases. *Id.* at 181, 286, 293. He disagreed that it would always be impossible to ascertain in advance whether a case would yield footage because that could be reflected in the preexisting case history either at ICS Merrill or from another investigative company. *Id.* at 181-84.[3]

As proof that Lott was given fewer assignments upon the arrival of Shelton, Lott presented the affidavit of William Linegar, a white male field investigator for ICS Merrill in the Michigan division who was permitted to work on cases that Lott was not. R. 27-3 (Linegar Aff. at ¶ 5). Linegar stated that he personally had requested permission to have Lott assist him on a case that required a "second man" and that Lott had agreed to the hours, but when Linegar notified the case manager, Shelton immediately called and informed him not to use Lott. *Id.* When Linegar suggested his son Scott Linegar as an alternative, also a white male, Shelton approved. Linegar further stated that Shelton removed Lott from at least two other cases and replaced him with other people with no explanation other than that "she was in charge." *Id.* Admittedly, the affidavit does not explicitly state that Lott was replaced with "other *white* people," but Lott testified at his deposition—and ICS Merrill did not dispute—that Lott was the only African American field investigator in the Michigan division. R. 26-3, Ex. B (Lott Dep. at 314).

---

[3]The defendant incorrectly seizes on Lott's concession that it would be impossible to tell in brand new cases whether the case would yield footage, R. 26-3, Ex. B (Lott Dep. at 185), as proof that it would be impossible to tell in all cases, Appellee Br. at 8, 22. The defendant also points to Lott's inability to identify at his deposition which of the twelve cases he had in 2008 were "no movement" cases, but the defendant takes Lott's testimony out of context. Appellee Br. at 21. Lott testified that he would need to look at more than just the name of the claimant to make that determination and stated that without more he did not know. R. 26-3, Ex. B (Lott Dep. at 322).

The district court granted the defendant summary judgment on both claims. Lott appeals only regarding his racial discrimination claim.

## II.  STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006).  When there is no genuine issue of material fact and the issue may be resolved as a matter of law, the moving party is entitled to summary judgment.  Fed. R. Civ. P. 56(a).  We construe the evidence on summary judgment in the light most favorable to Lott as the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.  RACIAL DISCRIMINATION CLAIM

Title VII prohibits employers from discriminating against an employee "because of such individual's race."  42 U.S.C. 2000e-2(a)(1).  This prohibition extends to disparate treatment, i.e. when an employer treats some employees "less favorably than others because of their race." *Dunlap v. Tenn. Valley Auth.*, 519 F.3d 626, 630 (6th Cir. 2008).  Where, as here, the plaintiff offers only circumstantial evidence of racially motivated disparate treatment, we employ the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to evaluate his claim.  Under this framework, the plaintiff bears the initial burden of making a prima facie showing of racial discrimination.  If he does, the burden of production (but not persuasion) shifts to the

employer to articulate a legitimate, nondiscriminatory reason for its actions, which the plaintiff may rebut by proving that the stated reason was pretextual. *Dunlap*, 519 F.3d at 631 & n.4.

## A. Prima Facie Case

A plaintiff's initial burden to make a prima facie showing of discrimination is not onerous. *Id.* at 630. Lott satisfies this burden by showing "(1) that he is a member of a protected group; (2) that he was subject to an adverse employment action; (3) that he was qualified for the position from which he was fired; and (4) that he was treated differently than employees outside of the protected class for the same or similar conduct." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 561 (6th Cir. 2004). The parties do not dispute that Lott satisfies the first two elements. Lott is African American and he was terminated from his employment. On summary judgment, the defendant argued that Lott had failed to show the second two elements—Lott was not qualified for the position of field investigator because of his poor performance and he was not treated differently from any similarly situated non-African American employees. The district court found the facts to be insufficient to resolve the dispute over Lott's qualifications, but agreed with the defendant that Lott had not made a prima facie showing that he was treated differently. R. 31 (D. Ct. Order at 7-9). We disagree.

Lott has sufficiently established facts to survive summary judgment on a prima facie case of discrimination. With the first two elements conceded, Lott has also demonstrated facts to support a finding that he is a qualified individual. The defendant's only argument to the contrary is not based on his objective qualifications for the position; rather the defendant relies solely on the allegedly

7

non-discriminatory reason for firing him to argue he was not a qualified individual. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc) ("[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case."). We therefore agree with the district court that the facts are insufficient to grant summary judgment to the defendant on this ground.

With respect to the fourth element, we hold that the plaintiff has adequately demonstrated a material issue of fact regarding whether he was treated differently from someone who was similarly situated to him. To establish this element, the plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The district court determined that Lott "has not identified *any* white employees who were similarly situated to him, either by name or other distinguishing factor." R. 31 (D. Ct. Order at 8). We do not agree. Lott identified Scott Linegar, a white coworker, who was similarly situated to Lott in all relevant aspects. Both Scott Linegar and Lott were field investigators in the Michigan division with the same job responsibilities and same managers. Lott testified that to his knowledge, Scott Linegar was paid the same salary even though Scott Linegar had less prior experience than Lott did investigating claims. R. 26-3, Ex. B (Lott Dep. at 96-98). Lott offered evidence that he was treated differently from Scott Linegar by demonstrating that Lott was removed from cases that were then given to Scott Linegar, and Lott was ultimately

8

terminated and the other white employees were not.[4]  ICS Merrill has not disputed this evidence or offered any evidence to contradict it, and when all the evidence is viewed in the light most favorable to Lott we can conclude only that summary judgment in favor of the defendant on this ground was not warranted.

The district court determined that Lott was not similarly situated because he was unable to point to anyone else "who restricted the areas they were willing to travel to, were reprimanded for late reporting, who had a lower video percentage, or who were reprimanded for deficient video percentages," R. 31 (D. Ct. Order at 8), but most of these conclusions rest on disputed issues of fact. In the fall of 2007, when Lott claims his caseload was reduced, he testified that he had not restricted the area in which he was willing to work, and he had not been reprimanded for late reporting.  He testified that he had never been told that the company used a video-percentage requirement as a performance metric, nor was there evidence in the record that Lott's video percentage at the time subpar.  *See* R. 26-3, Ex. B (Lott Dep. at 173-75, 180-81, 194, 243, 249, 252, 286, 293, 320-21).  By early 2008, Lott testified that the quality of his cases noticeably declined, *id.* at 181, and he introduced Linegar's testimony that Shelton sought to avoid assigning cases to Lott, R. 27-3 (Linegar Aff. at ¶ 5).  The prima facie burden is not onerous, and we must view this evidence in the light most

---

[4]We agree with the defendant, however, that Lott has offered no evidence that he was treated differently from anyone with respect to pay raises.  Although Lott has offered evidence that he did not receive certain pay raises he believes were promised, he offers no testimony from himself or others that anyone else received those raises.

favorable to Lott when determining whether summary judgment was appropriate. *Dunlap*, 519 F.3d at 630.

The district court also held that there was an "inference that there was no discrimination" in light of the fact that Shelton and Lott were both African American. R. 31 (D. Ct. Order at 6) (citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996)). The same-group inference "has been explicitly rejected by the Supreme Court in the context of race and sex discrimination." *Wexler*, 317 F.3d at 574 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)). The district court therefore erred in relying on the same-group inference in granting summary judgment. We hold that Lott has satisfied his prima facie burden of demonstrating disparate treatment.

## B. Pretext

The defendant also moved for summary judgment on the basis that Lott could not establish that the employer's legitimate reason for terminating him was a pretext. The district court did not address this argument because it ruled on Lott's failure to establish a prima facie case. However, because the issue was fully presented to the district court, we hold that there is a genuine issue of material fact precluding summary judgment on this ground as well.

The defendant met its burden of producing a non-discriminatory business reason for terminating Lott by offering evidence that Lott's video percentage was only 8%, the second lowest in the company, and that he had turned in at least one report late. The burden therefore shifted back to Lott to show that these two metrics were pretext for intentional racial discrimination. *See Dunlap*, 519 F.3d at 631. A plaintiff establishes pretext by demonstrating "that the proffered reason (1) has

no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Singfield*, 389 F.3d at 564 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). Lott does not dispute the underlying fact of his video percentage or that one report was turned in late in March 2008. He does dispute that these actions were the actual motivations behind the defendant's challenged conduct and that such facts would be sufficient to warrant termination. "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). However, if "an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001).

We hold that Lott has satisfied his burden of producing sufficient evidence with which a jury could doubt ICS Merrill's honest belief in its explanation for Lott's termination. Lott has offered testimony that he was never informed of the company's policy regarding maintaining a 55% video percentage. The policy is not reflected in any handbook, training manual, or testimony in the record, other than Shelton's affidavit, and there is no document or testimony on record that failing to have a 55% video percentage would be grounds for discipline or termination. *See, e.g.*, 26-2, Ex. A (Employee Handbook); 26-4, Ex. C (Shelton Aff. ¶ 15). There is also no evidence that anyone else has ever been disciplined for having a low video percentage. Lott's immediate supervisor, Jason Gay, reported no problems in Lott's video percentage when he issued the "Performance Correction

11

Notice" on March 7, 2008, identifying only the timely receipt of reports. Not until Shelton's email on March 17, 2008, is Lott's video percentage ever identified, let alone listed as a cause for concern. *Cf. Chen*, 580 F.3d at 401 (rejecting claim of pretext given plaintiff's "eighteen-month history of performance problems, including two failed performance audits, a negative review for 2005, and a history of customer complaints and conflicts with coworkers"). And the 8% figure on which ICS relies reflects Lott's performance only on a small number of cases (thirteen) over a short time span (the first two months of 2008). R. 26-9, Ex. H (Case Status Report). Absent any indication that his earlier performance was deficient, a jury could accept Lott's explanation that he received unusually difficult cases during that two-month period.

Lott has also offered evidence that he was never warned of a problem with the timeliness of his reports until March 2008, despite supposed problems dating back to the fall of 2007. The emails from Jason Hunt request that Lott send him missing reports "at [his] earliest convenience." R. 26-5, Ex. D (Hunt Emails). In not one of the ten emails from Hunt to Lott, emails that Lott denies were indicative of tardiness, does Hunt ever suggest that failure to send the reports could result in disciplinary action. At most, Hunt reminds Lott on February 20, 2008, and again on March 5, 2008, to "[p]lease keep in mind that you have 24 hours" to submit reports. *Id.*; R.26-6, Ex. E (3/5/08 Hunt Email). When the March 17, 2008, notice is issued, Lott responds that he had never previously been warned or received a verbal correction regarding the issue of timeliness or video percentages. Nothing on the record suggests that Lott failed timely to submit any reports between March 7 and March 17 to justify a second warning. Lott was then told that he would have 90 days to improve his

video percentage and timeliness. In the next two months, Lott's video percentage increased to 20% with no evidence of any further timeliness problems. But, instead of waiting the full 90 days to see whether Lott's performance would continue to improve, Shelton terminated Lott after roughly 60 days.

The above-cited evidence offered by Lott creates a genuine issue of material fact as to whether ICS Merrill had an honest belief that Lott's video percentage or late report justified termination. Lott and Shelton offer competing views of whether field investigators were required to maintain a video percentage of 55% (or any other figure) in order to remain in good standing and dispute how many reports were ever turned in late. Summary judgment on the basis of pretext is not appropriate where, as here, "the question whether the defendant's proffered reason had a basis in fact came down to a credibility determination between two witnesses." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 724 (6th Cir. 2004), *cert. denied*, 546 U.S. 821 (2005). We will not determine whose version is more credible on summary judgment. *Anderson*, 477 U.S. at 255. Lott has demonstrated a material fact dispute regarding whether Shelton held an "honest belief" that Lott's performance justified termination. *Cf. Majewski*, 274 F.3d at 1117 (holding that the evidence supported employer's honest belief where plaintiff's declining performance was well-documented and verified, and plaintiff's relationship with supervisor investigated to ensure fair evaluation). We therefore decline to uphold the district court's decision on the basis of pretext.

## IV. CONCLUSION

For the aforementioned reasons, we **REVERSE** the district court's grant of summary judgment in favor of the defendant and **REMAND** for further proceedings consistent with this opinion.