NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0696n.06

Case No. 14-3959

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Dec 28, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| WILLIAM SHARP, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| JAMES PROFITT; BARRY SAUNDERS; | ) | DISTRICT OF OHIO |
| WASTE MANAGEMENT OF OHIO, INC., | ) | |
| | ) | |
| Defendants-Appellees. | | |

**O P I N I O N**

BEFORE: GUY, MOORE, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Waste Management of Ohio, Inc. asks its employees to follow a simple policy: if there is an incident on the job, report it immediately by obtaining and completing a single-page form describing the details. If an employee ignores this policy, Waste Management warns that it can terminate him. William Sharp says that he suffered a back injury while working on his trash-collection route for Waste Management. Rather than report the alleged injury in accordance with company policy, he filed nothing with Waste Management. When Waste Management heard about Sharp's related workers' compensation claim six months later, it asked him to fill out the required one-page report. But he refused—twice.

Waste Management terminated Sharp. He then sued Waste Management and two of its managers, James Profitt and Barry Saunders. He claims, in part, that his termination was retaliation for exercising his workplace rights under state and federal law, including the

Americans with Disabilities Act and the Family and Medical Leave Act. The district court granted summary judgment for Waste Management. We **AFFIRM**.

**I**

William Sharp worked at Waste Management, a waste removal services company in Montgomery County, Ohio, from 2007 to 2012 as a residential-route truck driver. Drivers like Sharp follow a daily route to pick up curbside residential trash. The position is physically demanding and dangerous. Drivers operate a 40-ton truck and haul heavy loads off the curb. Due to the risks presented both to employees and the public, Waste Management publishes safety rules in its Employee Handbook and holds regular training sessions to discuss safety problems as they arise.

One safety rule in the Handbook requires employees "to report all work-related injuries, accidents, near misses, and any health or safety hazards . . . immediately to [their] supervisor." R. 42-1, Handbook, Page 120. To comply with the rule, employees must obtain and complete an incident report form. The report itself is a one-page document. Besides asking for the date, time and location of the incident, the report also asks the employee to describe whatever problem he encountered. This information allows Waste Management to investigate incidents to determine how they might be avoided in the future and how the company should respond to any possible workers' compensation claims.

If an employee does not report an injury, the Handbook provides consequences: the "[f]ailure to [report] will result in corrective action up to and including termination." *Id*. The Handbook also lists the "progressive corrective action steps" that management will generally take when workers violate safety rules. *Id.* at 121. According to Profitt, a Waste Management

manager, an injury that would serve as the predicate for a workers' compensation claim is the kind "that should be reported." R. 33, Profitt Dep., PID 406.

Sharp became familiar with this incident-report process; injuries plagued him during his time at Waste Management. In 2010, Sharp developed work-related tendonitis in his elbow. Pursuant to the policy, Sharp completed an incident report. After this injury, he says that Joe Krieger, a former Waste Management manager, told him that he would be fired if he filed for workers' compensation. Sharp's wife, Pam, claims to have witnessed this conversation. Although Krieger no longer works for Waste Management, he denies ever saying this. Sharp says that, despite his injury, Krieger's comments made him just try to "block out Workers' Comp, period." R. 42, Sharp Dep., Page 87.

In January 2012, Sharp again suffered a work-related injury. This time, he says that his "raincoat got caught on the joy stick," and he fell from his truck and twisted his leg. *Id.* at 99. Once more, he completed an incident form as required by the policy, and he gave it to his new manager, Barry Saunders. He says that his earlier conversation with Krieger, however, still deterred him from filing for workers' compensation. Krieger no longer worked for Waste Management at this point—it fired him for failing to report a subordinate's workplace injury. Saunders, it turns out, had informed management that Krieger shirked his reporting duty.

The incident at issue in this case allegedly happened on March 27, 2012. On that day, Saunders was out of the office, leaving Ken Lane as the supervisor in charge. Sharp claims that while out on his route he encountered two large tree stumps that a customer had left curbside for pick up. He called Lane over the radio to ask what to do, and Lane responded "they ha[ve] to go, nothing is staying behind." *Id.* at 103. After lifting the first stump, Sharp says, he felt an

"explosion of pain" in his back. *Id.* at 103. He still lifted the second stump, however, and continued to work for about six hours.

At no point after this alleged injury did Sharp ever file the required incident report.[1] Sharp says that when he returned to the office on the day of the accident, Lane had already left. He claims that he did approach Lane the next morning about the injury, but Lane brushed him off. When Saunders returned two days later, on March 29, Sharp claims that he told him about the injury, but Saunders "didn't want to have [any]thing to do with it." *Id.* at 214. In any event, Sharp continued to work for three weeks, until April 18, when he went to the emergency room for back pain.

At this point, Waste Management approved Sharp's fourth FMLA leave in five-year employment, but it was still unaware that his back problems were supposedly work-related. Sharp had surgery in May 2012, but he states that he remained unsure what to do about workers' compensation. His wife claims to have tried calling Saunders and other high-level employees at Waste Management several times from April through July to discuss the matter.

Sharp returned to work on August 6, 2012, with restrictions from his doctor. No one made negative comments to him about his leave and Waste Management accommodated his return. Sharp followed a "work hardening program" under which he was given time to gradually return to his normal responsibilities. Waste Management honored his restrictions, and Sharp returned to driving his route while another employee loaded the waste.

On August 15, 2012, despite his alleged reservations, Sharp filed for workers' compensation based on the March back injury. Waste Management's corporate office learned

---

[1] In fact, Sharp submitted insurance paperwork stating that his injury was not even work-related. Sharp maintains that the injury *did* happen at work, but all four medical providers he saw agreed to omit that fact because Sharp feared losing his job.

about the claim on October 17. A few days later, on October 22, Waste Management realized that it did not have an incident report on file documenting Sharp's injury. Gretchen Busch, a regional Human Resources Manager, asked Saunders to address the missing report with Sharp. This led to several meetings between Waste Management officials and Sharp.

On the morning of October 23, Saunders met with Sharp in his office. Sharp says he acknowledged having filed for the workers' compensation and stated that although his March injury was work-related, he had been afraid to inform Waste Management. Saunders sent Sharp on his route and then spoke to Profitt about how to handle an incident report for something that happened over six months ago. Later that day, Sharp spoke over the radio with Saunders, Profitt, and Busch. During the call, Sharp alleges that Saunders ordered him to pull over because he was "not fit to be behind the wheel of a truck*." Id*. at 126. Saunders disputes this allegation saying that Sharp himself actually declared that he was not "fit to be behind the wheel[.]" R. 29, Saunders Dep., PID 210.

When Sharp returned, he met once more with Saunders. Sharp alleges that Saunders was "ranting and raving" about the workers' compensation claim. During the meeting, Saunders handed Sharp an incident report form and asked him to fill it out. Sharp says that he saw the document but thought it related to his workers' compensation claim or was a termination notice. Instead of looking at the form, Sharp demanded to take the document home so he could consult with his attorney. When Sharp refused to complete the form, Saunders told him to leave the office and to not report back the next day.

In the meantime, Sharp consulted his attorney, who then drafted a letter to Waste Management asserting that it had constructively discharged Sharp and that his termination violated his rights under four state and federal laws. On October 26, Sharp delivered the letter to

Saunders. At that point, Saunders left his office to get Profitt. When they returned, they asked Sharp for a second time to complete an injury report. Sharp replied that he would only do so with his attorney present. At that point, Saunders and Profitt told him to leave.

Saunders and Profitt contacted Busch and forwarded her the attorney's letter. Waste Management officials decided to terminate Sharp on October 29 and notified him on November 2. According to Waste Management, it terminated Sharp for failing to report his work-related injury and for refusing to complete an incident report form.

After his termination, Sharp sued Waste Management, Profitt, and Saunders. The parties filed cross-motions for summary judgment in June 2014. The district court granted Waste Management's motion and denied Sharp's in September. This appeal followed.

## II

We review a grant of summary judgment de novo. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Summary judgment is proper if there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. *Id.* (citing *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004)). "A dispute is 'genuine' only if [it is] based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).

## III

Sharp challenges the district court's grant of summary judgment on five claims: (1) Ohio Workers' Compensation Retaliation; (2) Wrongful Discharge in Violation of Public Policy; (3) ADA Disability Discrimination; (4) ADA Retaliation Claims; and (5) FMLA Retaliation. We start with his state law claims then proceed to the federal claims. But both his state and federal retaliation claims share a common flaw: Sharp fails to show that a genuine dispute exists

as to whether Waste Management's reasons for terminating him are pretextual. We discuss the issue in relation to his workers' compensation claim, but the reasoning applies equally to the federal retaliation claims we discuss later.

**A**

Sharp claims that Waste Management retaliated against him for filing a workers' compensation claim. What he ignores in coming to this conclusion, however, is how he violated—willfully and on multiple occasions—a company policy that contemplates termination as a punishment. Ultimately, this fact proves fatal to showing any genuine dispute on whether the reasons for his firing are pretextual. Whether he makes out even a prima facie case of a retaliatory motive is doubtful. But we need only discuss the issue as background.

**1**

Ohio courts apply the same *McDonnell-Douglas* burden-shifting framework that is used to analyze federal retaliation and discrimination claims. *See, e.g., Onderko v. Sierra Lobo, Inc.*, 20 N.E.3d 322, 326 (Ohio Ct. App. 2014). Under this framework, "[o]nce an employee has set forth a prima facie case, the burden then shifts to the defendant to set forth a legitimate, non-retaliatory reason for the discharge. If the employer sets forth a legitimate, non-retaliatory reason, the burden again shifts to the employee to 'specifically show' that the employer's purported reason is pretextual and that the real reason the employer discharged the employee was because the employee engaged in activity that is protected under the Ohio Workers' Compensation Act." *Id.* (quotations and citations omitted); *see McDonnell Douglas Corp. v. Green*, 93 S.Ct. 1817, 1824, 411 U.S. 792, 802–03 (1973) (describing this test in relation to Title VII discrimination claims).

Ohio law prohibits employers from "tak[ing] any punitive action against any employee because the employee filed a claim . . . under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of employment with that employer." Ohio Revised Code § 4123.90. To establish a prima facie retaliation case, Sharp must show three things: (1) that he engaged in protected activity; (2) that Waste Management took an adverse employment action; and (3) that a causal link existed between his protected activity and the adverse employment action taken by Waste Management. *See Onderko*, 20 N.E.3d at 329–30, *aff'd*, Nos. 2014-1881, 2014-1962, 2016-Ohio-5027, ---N.E.3d---, at 36 (Ohio 2016) (affirming that proof "of injury at work is not an element of a prima facie case of retaliatory discharge under R.C. 4123.90").[2]

The causation element requires a plaintiff to show by a preponderance of the evidence that his discharge was retaliatory—that is, motivated by a workers' compensation filing. *Sutton v. Tomco Machining, Inc.*, 950 N.E.2d 938, 943 (Ohio 2011). Ohio courts consider many factors in determining causation, including "the length of time between the claim and the discharge, changes in salary level, hostile attitudes emerging, and *whether legitimate reasons exist for the discharge*." *Kent v. Chester Labs, Inc.*, 761 N.E.2d 60, 64 (Ohio Ct. App. 2001) (citing *Boyd v. Winton Hills Med. & Health Ctr., Inc.*, 727 N.E.2d 137 (Ohio Ct. App. 1999)) (emphasis added).

To show prima facie causation, Sharp relies on the timing of his termination, Krieger's alleged warning about workers' compensation, and Saunders's "hostile" reaction to Sharp's filing. His first point offers little support for causation in this context. As the Ohio Supreme Court has cautioned: "Because a discharge could be for reasons other than those related to workers' compensation, such as . . . a disregard by the employee for the employer's safety rules, .

---

[2] The parties originally disputed whether an "injury on the job" constituted an element of this claim, and we held this case in abeyance pending the Ohio Supreme Court's ruling in *Onderko*.

. . no presumption of retaliation arises from the fact that an employee is discharged soon after an injury." *Sutton*, 950 N.E.2d at 943. Waste Management terminated Sharp around a week after it learned about his claim. During this time, however, Waste Management also learned that Sharp violated a safety rule: he never reported his accident. Then, he blatantly refused to comply with the rule twice when asked by his managers.[3] In short, this is precisely the type of case where one can infer little about causation from the timing.

His next point might provide some support, but the statements have questionable value. Sharp's and his wife's statements that Krieger warned Sharp against filing for workers' compensation—something Krieger denies—happened over two years before his firing. This is simply too "isolated" in time from the termination decision to merit consideration. *See Gerding v. Girl Scouts of Maumee Valley Council, Inc.*, No. L-07-1234, 2008 WL 3198712, at *7 (Ohio App. Aug. 8, 2008); *McDermott v. Cont'l Airlines Inc.*, No. 2:06-cv-0785, 2008 WL 1766892, at *4–*5 (S.D. Ohio April 11, 2007). To have probative value, a manager's remarks must have some contextual relationship to the termination decision. *See McDermott*, 2008 WL 1766892 at *4–*5. Remarks made in relation to an entirely different matter, by someone who no longer worked at Waste Management, carry little weight. Especially when the remarks were simply "made too long before the layoff to have influenced the termination decision." *See Phelps v. Yale Sec.*, 986 F.2d 1020, 1026 (6th Cir. 1993) (holding that comments made "nearly a year" before a termination were too attenuated to have influenced the termination).

---

[3] The dissent says that it is a mischaracterization to call Sharp's actions "refusals." But he was presented with the form and then said he would not fill it out unless he could take it to an attorney. This may be a conditional refusal, but it is still a refusal. The dissent finds Sharp's actions reasonable and protected by the law. We read the case law to say otherwise. See part III.B (discussing Sharp's public policy claim).

This leaves Saunders's "ranting and raving" and a supposed statement that Sharp "had no right" to file a workers' compensation claim. Under the causation prong, courts can take into account "a reasonable suspicion that the injury was not job related[.]" *Sutton*, 950 N.E.2d at 943. And a manager may express his or her reasonable suspicion about an injury's illegitimacy without thereby creating a genuine dispute over retaliatory motive. *See McDermott*, 2008 WL 1766892 at *4 ("As general manager, Mr. Dooley had the right to question the legitimacy of Plaintiff's injury claim, and any statement he may have made to that effect is not evidence that Defendant intended to retaliate against Plaintiff for exercising his rights under the workers' compensation statute."). Saunders's reactions to Sharp demonstrate at most a suspicion Saunders filed a spurious claim. They do not indicate that Waste Management *fired* Sharp over the filing.

**2**

If the evidence establishes a prima facie case, it does so just barely. But a prima facie case does not end our analysis. Waste Management offers two legitimate reasons for Sharp's termination: breaking safety rules and insubordination. Sharp first failed to report an alleged injury for over six months, then refused to complete an incident report when asked twice by his managers. Thus, to survive summary judgment, Sharp must show a genuine dispute over pretext. "A plaintiff can show pretext in three interrelated ways." *Chen*, 580 F.3d at 400. He can show that an employer's reason (1) has no basis in fact; (2) that it did not actually motivate the employer's challenged conduct; or (3) that it was insufficient to warrant the challenged conduct. *Clay v. U.P.S.*, 501 F.3d 695, 704 (6th Cir. 2007). The ultimate inquiry, however, is still: "did the employer fire the employee for the stated reason or not?" *Chen.*, 580 F.3d at 400 n.4

Sharp channels his arguments into these elements so we address them as such. He first claims that Waste Management's reasons have "no basis in fact." This requires showing "more

than a dispute over the facts upon which his discharge was based" but also that the employer did not "honestly believe" in its proffered reason. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001). Sharp says that because he *attempted* to report the incident for three months, Waste Management's contention that he never reported the incident is simply untrue.[4] Further, he adds, a report that Waste Management's insurance administer generated after talking with Saunders should satisfy Waste Management's policy. Both arguments are nonsense. Neither his attempts nor the insurance administrator's report changes the undisputed facts: he never filed a report and then flatly refused to do so twice. Contrary to Sharp's assertions, concluding that Waste Management's reasons have a basis in fact requires no "credibility determination between two witnesses." *See Lott v. Merrill*, 483 F. App'x 214, 220 (6th Cir. 2012). It requires only an understanding of what the phrase "basis in fact" means.

Given that Waste Management's reasons have a factual basis, Sharp has to try a different tack. So he claims there is a dispute as to whether these reasons really motivated his termination. He argues that he can show this with evidence that Waste Management did not apply its disciplinary policy uniformly. In certain cases, we have found that "[e]vidence that the progressive-discipline policy asserted as a rationale for an employee's termination was not uniformly applied is evidence of pretext." *Lamer v. Metaldyne Co. LLC*, 240 F. App'x 22, 33 (6th Cir. 2007). In *Lamar*, for example, an employer cited its handbook's progressive-discipline

---

[4] The dissent asserts that Sharp actually reported this incident. As stated before, however, Waste Management required employees to report incidents by obtaining and filing a one-page report. Sharp merely presents testimony that he mentioned his injury to Saunders and Lane and then tried to call various managers. But he knew how he had to report injuries under Waste Management's policy. And he never had problems doing so in the past. At any rate, Sharp's testimony, even if credited as "reporting" the incident, still shows no dispute as to whether Waste Management honestly believed that he failed to report his incident. *See Sharp v. Waste Mgmt.*, Inc., 47 F. Supp. 3d 584, 603–04 (S.D. Ohio 2014).

policy as a reason for the plaintiff's termination, yet also denied the plaintiff procedural rights outlined in the handbook. *Id.* This inconsistency tended to show pretext. *See id.*

Sharp tries to cram his facts into the mold created by *Lamar*'s holding. As an initial matter, however, Waste Management's Handbook states that "each situation will be evaluated on a case-by-case basis and may result in escalating the progressive corrective action to a higher level, up to and including termination of employment on the first or second offense." R. 42-1, Handbook, at 36. So unlike *Lamar*, Sharp cannot point to any guaranteed response to his multiple overt acts of insubordination.

Instead, he collects disparate anecdotes about employees that Waste Management disciplined for inapposite conduct and then proceeds to make unreasonable inferences. He cites the written warnings made out to four employees for violating safety rules and then notes that Waste Management never produced a written incident report from those employees during discovery. As he notes, none were terminated. In presenting this supposed comparator evidence, however, Sharp ignores key differences. In each cited case, Waste Management learned about the incident between three and fourteen days later—not six months later. Further, the four never actually *refused* a manager's request to complete an injury report. To infer pretext from these four incidents is not reasonable, and they create no genuine dispute as to whether Waste Management applied its policy to Sharp in a way that shows pretext.

Sharp next says that everyone shirked reporting duties, so a jury could infer that Waste Management lied about its reasons for firing him. We have held that a plaintiff can show pretext if the "conduct for which he was disciplined and eventually terminated was common and accepted practice before and after his termination." *Hale v. ABG Freight Sys., Inc.*, 503 F. App'x 323, 334 (6th Cir. 2012). To show that Waste Management accepts non-reporting, he

points to Saunders's statement that likely "[e]very driver complains of soreness" and that, despite these complaints, Saunders would not ask employees to fill out an incident report. R. 29, Saunders I, PID 182. For their part, Profitt and Saunders acknowledge that they do not ask every complaining employee for paperwork and instead only demand written reports when employees mention a "specific event" that occurred at work. R. 33, Profitt Dep., PID 406. That Waste Management mercifully does not ask its workers to fill out forms every time they mention being sore or tired affords no support for pretext.

As additional evidence on this argument, Sharp draws our attention to what he terms "incentives" for underreporting. Managers must hide incidents, Sharp figures, because Waste Management disciplines them when their crew has too many accidents and gives them bonuses when it has fewer accidents. But there is nothing nefarious about Waste Management holding supervisors accountable for their subordinates' safety records. It creates no inference that managers actually shirk their reporting duties or that it would be tolerated. And Sharp offers only one example which does not particularly help him: Krieger. When Krieger failed to report an injury, Saunders—a fellow manager—informed upper management and completed a written report at management's request. Waste Management *terminated* Krieger over the incident. Sharp's evidence allows no reasonable inference that Waste Management encouraged or permitted non-reporting—let alone blatant insubordination. It affords even less reason to infer the reasons for firing him were merely pretextual.

In his final attempt to show pretext, Sharp claims that his conduct was insufficient to warrant termination. When "other employees . . . were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge," a jury can infer pretext. *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 286–87 (6th Cir. 2012).

Generally, a plaintiff shows his firing was unwarranted by comparing discipline received by others for similar or more serious conduct. *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666 (6th Cir. 2008). For instance, when an employer terminates black employees but "white employees [are] not fired—or disciplined whatsoever—despite engaging in substantially identical conduct," it indicates that even legitimate reasons offered for termination are pretext for discrimination. *Id.* at 676.

Sharp produces no equivalent situation that allows such an inference on retaliation. He identifies one employee that received a minor reduction from the default discipline policy provided for in the Handbook. In that case, the employee drove well over the speed limit but received only a final written warning instead of a final written warning *and* a three-day suspension. But insubordination is different in kind from mere negligence. Sharp's refusal to complete the form when asked to *twice* by his supervisors is not "identical" or even similar conduct to poor driving. Sharp has not created a genuine dispute as to whether Waste Management's reasons for firing him were merely a pretext for unlawful termination. Thus, both his workers' compensation retaliation claim and his federal retaliation claims fail.

**B**

Sharp next claims the district court erred in granting summary judgment to Waste Management on his Ohio public policy claim. The district court held Sharp could show no dispute over two elements: causation or a lack of an overriding justification for his termination. We agree with this holding because Sharp ultimately relies less on Ohio's public policy as it stands but rather on its unwarranted extension to his facts.

In order to make out a public-policy tort claim, a plaintiff must show four elements. First, that "a clear public policy exists manifested in a state or federal constitution, in statute or

administrative regulation, or in the common law (the clarity element)." *Sutton*, 950 N.E.2d at 943 (citing *Collins v. Rizkana*, 652 N.E.2d 653 (Ohio 1995)). Second, that "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element)." *Id.* Third, that "the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element)." *Id.* Fourth, that "the employer lacked an overriding legitimate business justification for the dismissal (the overriding-justification element)." *Id.*

The Ohio Supreme Court has recognized "that an employer's discharge of an employee for consulting a lawyer would violate public policy." *Chapman v. Adia Services., Inc.*, 688 N.E.2d 604, 609–10 (Ohio Ct. App. 1997); *see also Plona v. U.P.S.*, No. 1:06-cv-1144, 2007 WL 509747, at * 3 (N.D. Ohio Feb. 13, 2007). This policy applies squarely to a company retaliating against an employee for merely seeking legal advice about the merits of a potential lawsuit. *See Plona*, 2007 WL 509747 at *3. For example, if a company fires its employee for consulting an attorney about a potential personal injury claim against the company's client, then the company would violate Ohio's policy. *See Chapman*, 688 N.E.2d at 606–07.

Importantly, however, it is a policy against terminating an employee "*solely* for consulting an attorney." *Boyd*, 727 N.E.2d at 143; *Bickley v. FMC Techs., Inc.*, 282 F. Supp. 2d 631, 642 (N.D. Ohio 2003) (emphasis added); *see Taylor v. Volunteers of Am.*, 795 N.E.2d 716, 718 (Ohio Ct. App. 2003) (holding that Ohio has no clear public policy allowing an employee to actually sue his or her employer without being terminated). Thus, it only applies to conduct "outside the workplace." *See Plona*, 2007 WL 509747 at *3. Ohio does not force employers to accept employees injecting attorneys into common workplace matters. *See Maiden v. Ind. & Ohio Ry. Co.*, 353 F. Supp. 2d 952, 956–57 (N.D. Ohio 2005) ("Ohio does not support a right to

be represented by counsel at meetings with one's employer, and it certainly does not give employees (or their attorneys) the right to dictate the terms of those meetings."). As the district court recognized, forcing employers to do so would upset the "proper balance between the employee's interest in protecting recognized rights and the employer's interest in maintaining a loyal and responsive workforce." *Sharp v. Waste Mgmt., Inc.*, 47 F. Supp. 3d 584, 598–99 (S.D. Ohio 2014) (citing *Taylor*, 795 N.E.2d at 719).

To the extent Sharp contends that Waste Management terminated him *solely* for seeing an attorney, this is simply unsupported by the evidence. The comments Sharp cites on this element—such as Saunders's statement that "no one" gets a lawyer for workers' compensation— all came in response to his desire to consult an attorney before filling out an incident report. The comments allow no inference that Waste Management terminated him *solely* because he consulted an attorney outside the workplace about his possible legal claims.

Further, Sharp gave Waste Management legitimate reasons to terminate him. His actions—never filing an incident report for six months and then refusing to at all—implicated not only Waste Management's legitimate interest in maintaining managerial authority but also its more specific interest in ensuring compliance with safety rules. The latter interest is certainly legitimate here considering that Waste Management operates in "an inherently dangerous industry." *Sharp*, 47 F. Supp. 3d at 599 (citing *Sutton*, 950 N.E.2d at 943). Sharp could not inoculate himself against legitimate termination merely by conditioning his compliance with commonplace work procedures on discussion with his attorney.

To the extent Sharp believes, however, that Ohio public policy actually grants him a right to consult an attorney before completing basic paperwork, this is a remarkable proposition.

Unsurprisingly, he can cite no authority for it. Ohio never gave him a right to ask his attorney for help with his one-page incident report.

**IV**

Sharp's other retaliation claims and his discrimination claims arise under federal law, specifically the ADA and the FMLA. Like his Ohio retaliation claim, they are subject to the *McDonnell-Douglas* burden-shifting framework. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). Sharp has not presented a prima facie case on his discrimination claim. For his retaliation claims, he has not shown pretext.[5]

**A**

To make out a prima facie case of discrimination under the ADA, an employee must be "disabled." *Whitfield v. Tennessee*, 639 F.3d 253, 258-59 (6th Cir. 2011) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)). The ADA defines "disabled" to include persons with "physical or mental impairment that substantially limits one or more major life activities[.]" *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (citations omitted). The statute also considers as disabled those who are "regarded by [their] employer as having such an impairment." *Id.* The latter "regarded-as" theory of disability is not available, however, when an employer mistakenly believes that an employee has a merely "transitory and minor" impairment. 42 U.S.C. § 12102(3). Sharp concedes he was not actually disabled but argues that Waste Management believed him to be and then discriminated against him.

Sharp cites a single incident that he claims amounts to ADA discrimination on this theory. On October 23, 2012, just after Sharp met with Saunders about his workers' compensation claim, Sharp alleges that Saunders told him to pull his truck over because Sharp

---

[5] *See* Part III.A.2.

was "unfit" to be behind the wheel. This statement does not show that Waste Management mistakenly believed that Sharp had a "substantially limiting impairment." *See* § 12102(3)(B). Waste Management and Saunders knew about his workers' compensation claim and his alleged work-related injury when they sent him on his normal route that day. In fact, it knew about his back injury for months and let him drive his routes. These comments create no genuine dispute over whether Waste Management regarded Sharp as "disabled."

**B**

Next, Sharp argues that his termination resulted from the letter he provided to Saunders from his attorney listing his ADA claims. To prove an ADA retaliation claim, a plaintiff must show (1) that he engaged in a protected activity; (2) the employer knew of that activity; (3) the employer took an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). Significantly, the causation prong requires Sharp to show but-for causation. *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc).

To show causation, Sharp relies on his termination's timing in relation to the letter and again on the four employees who supposedly never reported incidents. As stated, timing shows little about causation here. And again, the four employees he cites are inapposite—none actually refused to complete an injury report. Sharp's evidence creates no genuine issue as to whether Waste Management would have retained him had he not exercised rights under the ADA. In any event, he still fails to create a genuine dispute over pretext.

**C**

Finally, Sharp argues that Waste Management violated his rights under the FMLA. The FMLA broadly prohibits employers from interfering with employees' rights under the statute.

*Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). This includes employer liability for retaliation.

Sharp simply repeats his argument that his attorney's letter to Waste Management, which referred to the FMLA, "triggered" his termination. To establish a prima facie case of retaliation, a plaintiff must show that "(1) he was engaged in a statutorily protected activity; (2) his employer knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (citing *Donald*, 667 F.3d at 761).

It is likely that causation in this analysis means actual or "but-for" causation. In *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2528 (2013), the Supreme Court interpreted Title VII's retaliation provision—which prohibits discrimination "because" an employee opposed an unlawful practice—to require a showing that "the desire to retaliate" was "the but-for cause" of an adverse employment action. (citing *Gross v. FBL Financial Servs.*, 557 U.S. 167, 176 (2009)). "We have often relied on Title VII precedent to analyze FMLA retaliation claims." *Hunter*, 579 F.3d at 691 (citing *Daugherty v. Sajar Plastics, Inc.,* 544 F.3d 696, 707 (6th Cir.2008); *Bell v. Prefix, Inc.,* 321 F. App'x 423, 428 n.2 (6th Cir.2009) (collecting cases)). And the FMLA prohibits employers from "discriminat[ing] against any individual *for* opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a) (emphasis added). "Because" and "for" are synonyms. *Roget's Thesaurus* § 154.10, p. 89–90 (4th ed. 1977); *Webster's 3d New Nat'l Dictionary* 886 (defining "for" as "with the purpose or object of"). Thus, given our interpretive practices and the meaning "for" has in the statute's context, it seems that FMLA retaliation requires a showing of but-for causation.

On this standard, Sharp has not made out a prima facie case. The letter's timing does little to create a genuine dispute given the context in which Waste Management terminated him.[6] In any event, we do not need to decide today whether but-for causation applies to the FMLA; it is enough that the evidence allows no dispute about whether Waste Management's reasons for Sharp's termination were pretextual.

## V

Defendants are entitled to summary judgment on each of Sharp's claims. For the foregoing reasons, we AFFIRM.

---

[6] Sharp argued in the district court that Waste Management terminated him due to his potential future FMLA leaves. This is an FMLA entitlement theory of liability. Sharp has not briefed this issue, but it has no merit. Under an FMLA entitlement theory, a plaintiff must establish, among other things, that the employer "denied the employee FMLA benefits to which he or she was entitled." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). Because Sharp has not alleged that he was denied benefits to which he was actually entitled, this claim fails.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** Because there are genuine disputes of material fact relevant to each of Sharp's claims, the district court erred by granting defendants' motion for summary judgment. Affirming the district court, the majority makes a crucial factual mistake in its opening sentence, which leads to several incorrect conclusions. The majority begins by stating that Waste Management imposes "a simple policy: if there is an incident on the job, report it immediately by obtaining and completing a single-page form describing the details." Maj. Op. at 1. Contrary to this assertion, it is not an undisputed fact that Waste Management requires employees to report injuries by completing incident reports. The record certainly makes clear that Waste Management requires employees to report injuries to their supervisors, but the record also indicates that verbal reports—not written incident reports—constitute reports. Because Sharp testified that he verbally reported his injury to his supervisor, the district court and the majority err by concluding that Waste Management had a legitimate reason to fire Sharp. I would reverse the district court.

## I. BACKGROUND

Plaintiff-Appellant William Sharp alleged that Defendants-Appellees James Profitt, Barry Saunders, and Waste Management of Ohio engaged in workers' compensation retaliation, Family Medical Leave Act (FMLA) retaliation, Americans with Disabilities Act (ADA) retaliation, and a violation of the Ohio public policy forbidding termination of an employee for consulting a lawyer. Defendants sought summary judgment on all claims. R. 41 (Def.'s Mot. for Summ. J. at 1). Sharp filed a response arguing that there were genuine disputes of material fact and that the case should proceed to trial. R. 49 (Opp. to Def.'s Mot. for Summ. J. at 59–60) (Page ID #1805–06). Sharp also filed a motion for partial summary judgment on the public-policy claim. R. 43 (Pl.'s Mot. for Partial Summ. J. at 34) (Page ID #1457).

The district court's order and the majority opinion incorrectly apply the summary-judgment standard. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (second alteration in original). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). That is, "[w]eighing of the evidence or making credibility determinations are prohibited at summary judgment—rather, all facts must be viewed in the light most favorable to the non-moving party." *Keweenaw Bay Indian Cmty. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007).

Contrary to these well-established rules, the majority construes the facts in favor of the defendants and against Sharp. Correct application of these rules leads to the conclusion that there are genuine disputes of material fact that a jury should resolve.

## II. WORKERS' COMPENSATION RETALIATION

Sharp alleges that Waste Management fired him in retaliation for filing a workers' compensation claim, in violation of Ohio Rev. Code § 4123.90. The majority correctly explains that workers' compensation retaliation claims are governed by the *McDonnell-Douglas* burden-shifting framework. *Glenn v. Hose Master, L.L.C.*, 61 N.E.3d 609, 611–12 (Ohio Ct. App. 2016). Under this framework, the employee must state a prima facie case; if the employee states a prima facie case, the burden shifts to the employer to state a legitimate, nonretaliatory reason for the discharge; if the employer states a legitimate reason for the discharge, the burden shifts

back to the employee to establish that the employer's stated reason is pretext for retaliation. *Id.* at 612; *see also Onderko v. Sierra Lobo, Inc.*, Nos. 2014-1881, 2014-1962, 2016 WL 3922905, at *5, 8 (Ohio July 21, 2016) (holding that to state a prima facie case of retaliatory discharge, an employee must show that the employer took adverse employment action because the employee filed a workers' compensation claim, not that the employee suffered a workplace injury).

The majority determines that defendants are entitled to summary judgment because Sharp cannot show that there is a genuine dispute over pretext. According to the majority, Waste Management had two legitimate reasons for firing Sharp—his "fail[ure] to report an alleged injury for over six months" and his "refus[al] to complete an incident report when asked twice by his managers"—and Sharp cannot show that these reasons are pretextual. Maj. Op. at 10. Yet Sharp contests both that he failed to report an injury and that he refused to complete an incident report. In determining that Sharp's testimony does not create a genuine dispute of material fact, the majority at best draws inferences against Sharp and at worst mischaracterizes his statements.

First, Sharp says that he did report the alleged injury. Sharp attests that he "told Saunders that [he] had injured [his] back lifting tree stumps on [his] route," but that Saunders responded that Sharp's injury was out of his hands. Sharp Aff. at ¶ 12. Sharp also attests that, "in addition" to speaking directly with Saunders, Sharp and his wife "made numerous attempts to inform Defendants by telephone" of the injury. Sharp Aff. at ¶¶ 13–14, 18.

Discussing Sharp's testimony, the majority states, "Sharp says that because he *attempted* to report the incident for three months, Waste Management's contention that he never reported the incident is simply untrue." Maj. Op. at 11. This statement does not accurately reflect Sharp's testimony. It seems to ignore altogether Sharp's statement that he told Saunders about the injury. Otherwise, it incorrectly characterizes Sharp's statement that he told Saunders about

the injury but Saunders did not want to hear about it as an attempt to report the injury, rather than an actual report that Saunders disregarded.

The majority defends its conclusion that Sharp never reported the incident, despite telling Saunders about it, by arguing that Sharp was required to report the injury in a specific way—namely, by filling out a written incident report. Maj. Op. at 11 n.4. This argument fails because the record does not indicate that only written incident reports satisfy the reporting requirement. Instead, the record suggests that verbal reports satisfy the reporting requirement.

The Waste Management Employee Handbook addresses safety in two different sections. In the "General Work Rules" section, the handbook says, "Failing to immediately report to the Company any accident involving property damage or injury of any kind whether or not the employee is at fault" could result in corrective action, including termination. R. 43-17 (Employee Handbook at 37, 39) (Page ID #1514, 1516). In the "Safety Policy" section, the handbook says, "You are instructed to report all work-related injuries, accidents, near misses, and any health or safety hazards, including violations of safety procedures, immediately to your supervisor. Failure to do so will result in corrective action up to and including termination." *Id*. at 35 (Page ID #1512). The only specific guidance the handbook gives employees about how to report injuries is specifying that they must report injuries "to [their] supervisor." *Id*. The handbook does not specify any particular method for reporting injuries to supervisors—in particular, it makes no mention of incident reports.

Portions of the record indicate that Waste Management expected employees to fill out incident reports for on-the-job injuries. For example, in a write-up about the incident, Saunders said that, "a driver statement . . . is a requirement for all incidents and injuries." R. 41 (Def.'s

Mot. for Summ. J., Ex. N, 10/26/2012 Letter from Saunders at 1). Sharp himself believed that company policy required incident reports for workplace injuries. R. 42 (Sharp Dep. at 79).

On the other hand, nothing in the record suggests that an employee fails to report an injury unless he submits an incident report. Based on the record before us, one reasonable inference is that submitting an incident report is an additional requirement that employees must complete after reporting injuries. And while the handbook is explicit that an employee can be terminated for failing to report an injury to a supervisor, it does not even suggest that an employee can be terminated for failing to fill out paperwork about an injury after reporting it.

The testimony of another Waste Management Employee supports this inference. Anthony Bohman discussed an occasion where he hurt his shoulder on the job. He explained that he "talked to James Profitt when we got back to the shop. I told him what happened and I told about my injury." R. 39 (Bohman Dep. at 25) (Page ID #755). When asked, "Did you ask him for an incident report form?" Bohman responded, "*I was reporting an incident. That's what would trigger for him to hand out the incident report form.*" *Id.* (emphasis added). This testimony suggests that Waste Management employees understood company policy to define "reporting" an injury to mean verbally informing a supervisor of the injury, and regarded filling out an incident report as a step that occurred after reporting the injury. This understanding makes sense in light of the Employee Handbook's emphasis on reporting injuries, on the one hand, and the Handbook's failure to even mention written incident reports, on the other.

Because at this stage we must credit Sharp's testimony and draw reasonable inferences in his favor, because one reasonable inference (and, frankly, the most reasonable inference) is that verbally reporting an injury to a supervisor constitutes reporting the injury, and because Sharp

testified that he verbally reported his injury to his supervisor, the majority errs by determining that Sharp did not report his injury.

The majority's argument that "Sharp's testimony, even if credited as 'reporting' the incident, still shows no dispute as to whether Waste Management honestly believed that he failed to report his incident," also fails. Maj. Op. at 11 n.4. It is reasonable to infer that Waste Management managers knew that their policy defined reporting as verbal reporting. It is also reasonable to infer that Saunders knew that Sharp had verbally reported the incident to Saunders. At the summary-judgment stage, we must draw these inferences in favor of Sharp rather than rushing to apply the honest-belief rule.

Second, Sharp says that he did not refuse to complete an incident report. Sharp attests that when Saunders asked him to fill out a document, which he "concluded . . . was related to workers comp.," he "told Saunders that [he] would be glad to fill it out if [he] could take it home and consult with [his] attorney." Sharp Aff. at ¶¶ 36–37. He attests that after Saunders admonished him for consulting an attorney about workers' compensation, Saunders told Sharp to leave and not come back to work. *Id*. at ¶¶ 38–41.

The majority characterizes this exchange as Sharp's refusal to fill out the incident report, adding that it "may be a conditional refusal, but it is still a refusal." Maj. Op. at 9 n.3. Even the majority's characterizing this exchange as a conditional refusal draws improper inferences in favor of the moving party. It would perhaps be possible to infer that Sharp was refusing to fill out the paperwork, but it is also possible to infer that Sharp was confused about the paperwork, wanted to talk with an advisor, and would submit the completed paperwork promptly after consulting an attorney. Characterizing this potentially ambiguous exchange as a refusal to fill out the incident report draws inferences in favor of defendants, i.e., the moving party.

When not mischaracterized or impermissibly construed in defendants' favor, Sharp's testimony that he told Saunders about his injury and said he would fill out the paperwork after talking with an attorney creates a genuine issue of material fact as to whether defendants had a legitimate reason to fire Sharp. This factual dispute makes summary judgment inappropriate.

There are additional disputes of material fact as to pretext, which also make summary judgment inappropriate. As evidence of pretext, Sharp points to examples of other employees who failed to report incidents and were not fired. He says these examples provide evidence that Waste Management did not uniformly apply its policy and that his conduct did not warrant termination. The majority correctly acknowledges that the Sixth Circuit has found the non-uniform application of a disciplinary policy to be evidence of pretext. Maj. Op. at 11 (citing *Lamer v. Metaldyne Co.*, 240 F. App'x 22, 33 (6th Cir. 2007)). Then the majority asserts that Sharp ignores key differences between his situation and the examples. It declares that "[t]o infer pretext from these four incidents is not reasonable, and they create no genuine dispute as to whether Waste Management applied its policy to Sharp in a way that shows pretext." Maj. Op. at 12. Of course, the four examples Sharp cites are not identical to his own situation. These examples do involve employees failing to report incidents that Waste Management's policies require them to report. *See* R. 49 (Opp. to Def.'s Mot. for Summ. J. at 58) (Page ID #1804). These examples are similar enough to Sharp's situation to permit an inference of pretext. A jury, not this court, should ultimately determine whether to infer pretext.

Similarly, the majority incorrectly concludes that Waste Management's possible incentive for supervisors to underreport injuries does not create a factual dispute as to pretext. There is no dispute that Waste Management disciplines supervisors when their crews have too many accidents and gives supervisors bonuses when their crews have few accidents.

The majority, with no evidentiary support, asserts that this system "creates no inference that managers actually shirk their reporting duties or that it would be tolerated." Maj. Op. at 13. Whether supervisors underreport injuries is another question that a jury, not this court, should answer.

Because there are numerous disputes of fact that a jury should resolve, the district court's grant of summary judgment on the workers' compensation retaliation claim should be reversed.

### III. ADA DISCRIMINATION AND RETALIATION AND FMLA RETALIATION

The majority also asserts that there are no facts alleged that would allow a jury to conclude that defendants violated Sharp's ADA or FMLA rights. Contrary to this assertion, there are several disputed material facts relevant to these claims. For the most part, the disputed facts that are relevant to the ADA and FMLA claims are the same disputed facts that are relevant to the workers' compensation claim discussed above.

The *McDonnell-Douglas* burden-shifting framework applies to Sharp's ADA and FMLA claims. As to the ADA claims, there are disputes of material fact relevant to the first step of the framework, whether Sharp can make out a prima facie case of ADA retaliation or a prima facie case of disability discrimination.

Addressing Sharp's ADA retaliation claim, the majority again dismisses as "inapposite" Sharp's examples of other employees who failed to report incidents in accordance with Waste Management's policy but were not fired. Maj. Op. at 18. Again, whether or not these examples could convince a jury that defendants treated Sharp differently than other employees should be up to a jury.

The majority also says that the timing of Sharp's termination—just after Waste Management received a letter from Sharp's attorney outlining his potential legal claims,

including ADA claims—cannot raise an inference that Sharp was fired in retaliation for exercising his ADA rights. Maj. Op. at 18. To support this view, the majority reiterates its view that there is no dispute that Sharp failed to report his injury and refused to fill out workers' compensation paperwork. It indicates that these facts render the timing irrelevant. Other than again incorrectly asserting that these two facts are not disputed, the majority provides no explanation for why the timing of Sharp's termination could not support a jury finding of ADA retaliation.

As for the disability-discrimination claim, the majority also asserts that Sharp's testimony that Saunders said Sharp was not fit to drive does not show that Saunders regarded Sharp as disabled. The majority mentions that Saunders let Sharp drive before telling him he was unfit to drive. From that fact, it concludes that Saunders's statement could not mean he regarded Sharp as disabled. Maj. Op. at 18. Weighing Saunders's past acts more heavily than his statement draws an inference in favor of defendants.

There are also disputes of material fact relevant to whether Sharp can make out a prima facie case for FMLA retaliation. Addressing Sharp's FMLA retaliation claims, the majority simply reiterates its assertions that the timing of Sharp's termination is not sufficient evidence of causation and that Sharp cannot show that Waste Management's reasons for firing him were pretext. Maj. Op. at 20. As discussed above, these assertions either glide over questions that should be answered by a jury or mischaracterize Sharp's evidence.

Because there are material factual disputes, the district court's grant of summary judgment on these claims should be reversed.

## IV. PUBLIC-POLICY CLAIM

Finally, the majority argues that defendants are entitled to summary judgment on Sharp's Ohio public-policy claim. Although both parties moved for summary judgment on this claim, there is a genuine dispute of material fact and summary judgment is not appropriate.

Sharp argues that Waste Management fired him for consulting an attorney. It is a violation of Ohio public policy to fire an employee for consulting an attorney. *Chapman v. Adia Servs., Inc.*, 688 N.E.2d 604, 609–10 (Ohio Ct. App. 1997); *see also Boyd v. Winton Hills Med. & Health Ctr., Inc.*, 727 N.E.2d 137, 143 (Ohio Ct. App. 1999) ("[I]n *Chapman v. Adia Servs., Inc.* . . . we held that Ohio's public policy prohibits an employee from being fired solely for consulting an attorney.").

The majority asserts that defendants' comments telling Sharp he cannot consult an attorney about his workers' compensation claim do not support the inference that Sharp was fired for consulting an attorney. Maj Op. at 16. Here again, the majority glides over a disputed of fact instead of recognizing that this case presents a quintessential jury question. Sharp testified that defendants told him he could not consult an attorney about workers' compensation and that when he insisted on consulting an attorney they terminated him. Sharp Aff. at ¶¶ 5, 37–41. He argues that this exchange justifies the inference that Waste Management fired him because he consulted an attorney about workers' compensation. Defendants dispute Sharp's testimony and say they fired Sharp for failing to follow the company policy about reporting workplace injuries. R. 41 (Def.'s Mot. for Summ. J., Ex. A, Saunders Decl. at ¶ 9). This is a factual dispute that a jury should resolve.

The district court's grant of summary judgment on the public-policy claim should be reversed as neither party is entitled to summary judgment on this claim.